**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**No. 00-30723**

---

**THERMO TERRATECH formerly known as THERMO PROCESS SYSTEMS, INC.;**
**TPS TECHNOLOGIES, INC.,**

Plaintiffs-Appellants,

v.

GDC ENVIRO-SOLUTIONS, INC., et al.,

Defendants,

and

**KATHLEEN ELNAGGAR, Individually, as successor of Hameed Elnaggar**
**and as Trustee of the Tarek Elnaggar Testamentary Trust, the**
**Sarif J. Elnaggar Testamentary Trust, and the Jeanne M. Elnaggar**
**Testamentary Trust as Successors of Hameed Elnaggar,**

Defendant-Third Party Plaintiff-Appellee.

v.

**SCOTTSDALE INSURANCE COMPANY,**

Third Party Defendant-Appellee.

---

**Appeal from the United States District Court**
**for the Middle District of Louisiana**

---

**September 24, 2001**

Before DAVIS and JONES, Circuit Judges, and BARBOUR,[*] District

Judge.

BARBOUR, District Judge:

---

[*] District Judge of the Southern District of Mississippi, sitting by designation.

Plaintiff-Appellants filed suit in the United States District Court for the Middle District of Louisiana to recover attorneys' fees and costs incurred in defending a civil action brought by Boston Old Colony Insurance Company ("Boston Old Colony"), the subrogee of GDC Enviro-Solutions, Inc. ("GDC"). United States Magistrate Judge Stephen C. Riedlinger found that Appellants, pursuant to the indemnification clause and the "Personal Guarantees" clause contained in the sales agreement entered between GDC and TPS Technologies, Inc. ("TPST"), were entitled to recover from the Elnaggar defendants reasonable attorneys' fees and expenses incurred in defending the claims of Boston Old Colony. Appellants also sought to recover these attorneys' fees and costs from Appellee Scottsdale Insurance Company ("Scottsdale"), the general liability insurer of GDC. Scottsdale did not dispute that the attorneys' fees and costs sought by Appellants were covered under the terms of a comprehensive general liability insurance policy ("CGL policy") issued to GDC by Scottsdale. The magistrate judge, however, found that two exclusions contained in the CGL policy barred recovery by Appellants against Scottsdale. In this diversity case involving interpretation of the comprehensive general liability policy under Louisiana law, Plaintiffs-Appellants Thermo Terratech ("Terratech") and TPST appeal from the grant of judgment to Defendant-Appellee Scottsdale. We reverse.

## I. Factual Background and Procedural History

GDC entered a contract with Rubicon, Inc. ("Rubicon") to incinerate hazardous materials at the Rubicon plant located in Geismar, Louisiana. To facilitate this contract, GDC and its sole shareholders Hameed A. Elnaggar and Kathleen Elnaggar entered a sales and service agreement with Terratech and TPST whereby TPST agreed to design, develop, manufacture, and deliver a portable hazardous waste incinerator for the Rubicon plant. The sales agreement also required TPST to provide two "lead operators," the primary duty of whom was to train the employees of GDC to operate the incinerator. Ron Waligora ("Waligora"), a mechanical engineer, was one of the lead operators assigned to the Rubicon plant pursuant to the sales agreement.

The liquid waste incinerator provided by TPST for the Rubicon plant was equipped with three redundant systems, the purpose of which was to provide an emergency flow of water to cool the system in the event that temperatures in the incinerator exceeded normal, a power failure occurred, or the main induce draft fan was not functioning. In January of 1991, a problem developed with one of the variable speed control drivers ("driver"), an electrical component of the incinerator. GDC contacted I.D.M. Controls ("I.D.M.") of Baton Rouge, Louisiana, to repair the driver. At the

request of GDC, I.D.M. Controls dispatched one of its field technicians, Dan Lee ("Lee") who disconnected power to the control panel in which the driver was housed, removed the driver, and

transported it to Baton Rouge for repair. Upon completion of the repairs, the driver was returned to the Rubicon plant and reinstalled by Lee.

On February 21, 1991, GDC discovered a problem with another of the drivers in the control panel. I.D.M. was again contacted to repair the driver, but GDC decided to use its own employees to remove and transport the driver to Baton Rouge. GDC operator George Daher contacted Waligora, stated that he was going out-of-town, and requested that Waligora remove the driver the following morning. It is undisputed that other non-engineer GDC operators had received training with regard to the procedure to be utilized when disconnecting the power supply to the control panel. It is further undisputed that several non-engineer GDC employees had the training necessary to remove the damaged driver.

On February 22, 1991, Waligora initially consulted the incinerator log book which indicated that cooling water was being supplied by the recirculating pumps. Waligora then assessed the control panel and, upon finding that the recirculating pump light was not illuminated,[1] assumed that the recirculating pumps had been turned off and that one of the alternate water supply systems was cooling the incinerator. Although Waligora knew that two of the redundancies, the Hale fire pump and John Deere emergency diesel, were either not functioning or not enabled respectively, he was

_____

[1] Waligora did not test the lights on the control panel to determine whether the bulbs functioned.

4

unaware that the third, the solenoid valve to the emergency supply, had been closed by the GDC operators because it had developed a leak. Therefore, the only devices providing cooling water to the incinerator were the recirculating pumps which would cease to function at the time power to the control panel was disconnected to facilitate removal of the damaged driver.

Christopher Covert ("Covert"), an associate engineer employed by GDC to supervise construction of the primary furnace for the Rubicon plant, was present at the process control panel of the incinerator. Prior to the time Waligora disconnected power to the control panel, he informed Covert that the disruption would cause certain readings on the panel to remain constant while others would read zero. Waligora then disrupted power to the control panel thereby disconnecting the recirculating pumps. Although several alarms signaled on the control panel, they were silenced by Covert as it was his belief, based on Waligora's statement, that abnormal readings were to be expected and could be ignored. A fire in the incinerator ensued shortly after power to the control panel was disconnected.

GDC and TPST entered an Agreement of Settlement, Release, Transaction and Compromise to resolve all claims then existing between the parties including claims that arose because of the fire. GDC indicated that its primary purpose in entering the settlement was to obtain insurance proceeds to effectuate replacement of the damaged incinerator and to resume operations.

5

Thereafter, Boston Old Colony, the fire insurer and subrogee of GDC, filed suit against TPST and its parent corporation Terratech, in part to recover the insurance proceeds paid to GDC. The case was heard by United States Chief District Judge John V. Parker who, after a trial and consideration of the post-trial briefs submitted by the parties, found that: "The sole cause of the fire was the negligence of Waligora in removing the [driver] for the main induce fan without making sure that it was safe to do so, i.e. without making sure that the cooling water supply would not be interrupted."[2]  Judge Parker additionally found that under the terms of the sales agreement entered by TPST and GDC, the latter agreed to indemnify and hold TPST harmless from claims of the nature asserted in the complaint thereby precluding the ability of Boston Old Colony, as subrogee of GDC, to recover on those claims.[3] Judgment was entered in favor of TPST and Terratech and the case was dismissed on January 5, 1995. The decision of the district court was affirmed on appeal.[4]

On January 8, 1997, Terratech and TPST ("Appellants") filed suit against GDC and Kathleen Elnaggar in her individual and representative capacities ("Elnaggar") to recover the attorneys' fees and costs incurred in defending the Boston Old Colony

---

[2] Boston Old Colony Ins. Co. v. Thermo Process, et al., No. 91-905-A, slip op. at 6-7 (M.D. La. Jan. 5, 1995).

[3] Id. at 19.

[4] See Boston Old Colony Ins. Co. v. Thermo Process et al., 95 F.3d 54 (5th Cir. 1996).

6

litigation.[5]  During the period relevant to the underlying dispute, GDC and Elnaggar had in effect a comprehensive general liability insurance policy ("CGL policy"), the insurer of which was Appellee Scottsdale.  On June 26, 1997, GDC and Elnaggar filed a third party complaint against Scottsdale after Scottsdale refused their tender of defense.  On December 31, 1997, Appellants filed an amended complaint whereby Scottsdale was named as a principle defendant in the case.[6]  The parties consented to have the case heard by United States Magistrate Judge Stephen C. Riedlinger.

On May 1, 1998, Appellants moved for summary judgment on the issue of liability against Elnaggar an Scottsdale.  In response, Scottsdale argued that the claims asserted by the Appellants were excluded from coverage under the "Contractual Liability Coverage" exclusion ("Contractual Liability exclusion")[7] and/or the

---

[5]  Sometime after the lawsuit was filed, GDC filed a petition for bankruptcy relief.  On April 8, 1998, all proceedings with regard to GDC were stayed pending order of the bankruptcy court.

[6]  Scottsdale was named a defendant pursuant to the Louisiana direct action statute which provides, in relevant part:
> The injured [party] ... at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and, such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Code of Civil Procedure Art. 42 only.

LA. REV. STAT. ANN. § 22:655(B)(1) (West 1995).

[7]  The CGL policy provides, in relevant part:
I.  Contractual Liability Coverage
   ....

7

"Engineers, Architects or Surveyors Professional Liability exclusion ("Professional Liability exclusion").[8] The magistrate judge granted summary judgment in favor of Appellants against Elnaggar, and found that TPST could recover reasonable attorneys' fees and costs from Elnaggar pursuant to the indemnification clause and the personal guarantee clause contained in the sales agreement. With regard to Scottsdale, the magistrate judge found that the Contractual Liability exclusion did not bar recovery but denied summary judgment on the issue of whether the Professional Liability exclusion was applicable.

The case was heard by the magistrate judge on November 12, 1998. At the close of Appellants' case, Scottsdale moved for a judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. The magistrate judge, at that time and

---

(B) The insurance afforded with respect to liability assumed under an incidental contract is subject to the following additional exclusions:
    ....
(3) if the indemnitee of the insured is an architect, engineer or surveyor, to the liability of the indemnitee, his agents or employees, arising out of
    ....
(b) the giving of or the failure to give directions or instructions by the indemnitee, his agents or employees, provided such giving or failure to give is the primary cause of the bodily injury or property damage.

[8] The CGL policy provides, in relevant part:
It is agreed that the insurance does not apply to bodily injury or property damage arising out of the rendering of or the failure to render any professional services by or for the named insured, including
    ....
(2) supervisory, inspection or engineering services.

8

contrary to his prior ruling on the motion for summary judgment, found that coverage under the CGL policy was excluded under both the Contractual Liability exclusion and the Professional Liability exclusion. Judgment was entered in favor of Scottsdale on the claims asserted by Appellants in their amended complaint and on the third party claims asserted by Elnaggar.[9] This timely appeal followed.

## II.  Analysis

The interpretation by a district court of an insurance contract and the exclusions contained therein is a question of law and, therefore, subject to de novo review. See Jarvis Christian Coll. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 197 F.3d 742, 746 (5th Cir. 2000). As the subject CGL policy was delivered in the State of Louisiana, we interpret the provisions of the subject policy in accordance with the law of that state. See Adams v. Unione Mediterranea Di Sicurta, et al., 220 F.3d 659, 677 (5th Cir. 2000). Under Louisiana law, interpretation of an insurance policy is subject to the general rules of contract interpretation which requires judicial determination of the common intent of the parties to the contract. See Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So. 2d 759, 763 (La. 1994). The

---

[9]  Judgment was entered in favor of Appellants and against Elnaggar in the amount of $245,215.69 which represents the reasonable attorneys' fees and costs incurred by Appellants in defending the lawsuit brought by Boston Old Colony and in bringing the lawsuit against Elnaggar to recover those fees and costs. Appellants did not appeal the judgment against Elnaggar.

9

intent of the parties, "as reflected by the words in the policy[,] determine the extent of coverage." Id. We construe the words of an insurance policy by applying their "general, ordinary, plain, and proper meaning ... unless [they] have acquired a technical meaning." Id. See also South Cent. Bell Tel. Co. v. Ka-Jon Food Stores of La, Inc., 644 So. 2d 357, 360 (La. 1994).

Exclusions to coverage contained in an insurance policy must be clearly and expressly set forth. See Omiga v. Rodriguez, 799 F. Supp. 626, 630 (M.D. La. 1992). When the language of an insurance policy is clear, it must be enforced as written. See Reynolds v. Select Props. Ltd., 634 So. 2d 1180, 1183 (La. 1994). If, however, the terms of the policy are ambiguous, they must be construed against the drafter of the policy. See Oaks v. Dupuy, 633 So. 2d 165, 168 (La. App. 2 Cir. 1995). Therefore, in the event the words contained in an exclusionary clause are susceptible to greater than one reasonable interpretation, we must adopt the interpretation that provides coverage to the insured. See Tulley v. Blue Cross Blue Shield of La., 760 So. 2d 1193, 1195 (La. App. 3 Cir. 2000).

Before determining whether the exclusions upon which Scottsdale relies are applicable, we must first determine whether the sales agreement entered by GDC and TPST is within the coverage clause of the policy. See Adams, 220 F.3d at 678. The CGL policy provides coverage for incidental contracts which are defined by the policy as "any oral or written contract or agreement relating to the conduct of the named insured's business." We find that the

10

sales agreement entered by GDC and TPST is an "incidental contract" as that term is defined by the CGL policy.

Scottsdale first contends that the claims asserted by Appellants are excluded from coverage under the Contract Liability exclusion. Under this exclusion, coverage is excluded for:

> [L]iability assumed under an incidental contract ... if the indemnitee of the insured is an ... engineer ... to the liability of the indemnitee, his agents or employees, arising out of ... the giving of or the failure to given directions or instructions by the indemnity, his agents or employees, provided that such giving or failure to give is the primary cause of the ... property damage.

We note that for this exclusion to apply the instruction given by Waligora to Covert, which prompted the latter to silence the alarms that signaled on the control panel after the power was disconnected, must be the "primary cause" of the fire and resulting property damage.

The term "primary" is defined to mean "first in importance; chief; principle." WEBSTER'S UNABRIDGED DICTIONARY 1429 (3d ed. 1983). Judge Parker, in the Boston Old Colony litigation, after citing to multiple negligent acts and/or omissions on the part of Waligora, concluded that: "The sole cause of the fire was the negligence of Waligora in removing the [driver] for the main induce fan without making sure that it was safe to do so, i.e. without making sure that the cooling water supply would not be interrupted." We acknowledge that Waligora's instruction to Covert and/or his failure to give instructions to other GDC employees to ensure that

11

the incinerator redundancies were operational are factors that contributed to his negligent act of failing to ensure that the incinerator was supplied with an alternate source of cooling water during the period of time in which power was disconnected to the control panel. We conclude, however, that the primary or principle cause of the fire was Waligora's negligent act of disconnecting power to the control panel, thereby disrupting power to the main induce fan which was the only device providing cooling water to the incinerator at that time. Given the facts of this case, we conclude that the instructions given, or failed to be given by Waligora were not the primary cause of the fire, and that the Contract Liability exclusion does not apply to bar coverage. Accordingly, we reverse the decision of the magistrate judge that the Contractual Liability exclusion barred recovery by the Appellants under the CGL policy.

Scottsdale also contends that the claims asserted by Appellants are excluded from coverage under the Professional Liability exclusion. Under this provision, coverage is excluded for "property damage arising out of the rendering or the failure to render any professional services by or for the insured including ... engineering services." "Professional services" are defined under Louisiana law "as 'services performed by one in the ordinary course of the practice of [one's] profession, on behalf of another.'" Jensen v. Snellings, 841 F.2d 600, 613 (5th Cir. 1988) (quoting Aker v.

<u>Sabatier</u>, 200 So. 2d 94, 94 (La. App. 1st Cir. 1967)). To determine whether services are professional in nature, we look:

> [T]o the character of the services performed, such as whether special knowledge and technical expertise are required, rather than the title or character of the party performing the services. Acts which could have been done by an unskilled or untrained employee are not subject to a professional services exclusion. Professional services involve discretion acquired by special training and the exercise of special judgment.

<u>Abramson v. Florida Gas Transmission Co.</u>, 908 F. Supp. 1389, 1394 (E.D. La. 1995) (quoting <u>Natural Gas Pipeline Co. of America v. Odom Offshore Surveys, Inc.</u>, 697 F. Supp. 921, 928 (E.D. La. 1988), <u>aff'd</u>, 889 F.2d 633 (5th Cir. 1989)). <u>See</u> <u>also</u> <u>American Cas. Co. v. Hartford Ins. Cas. Co.</u>, 479 So. 2d 577 (La. App. 1st Cir. 1985). Therefore, for the Professional Liability exclusion to apply, the fire and resulting property damage must have arisen from Waligora's rendering, or his failure to render, an engineering service.

We find that the actions taken by Waligora were not professional services as that term is defined under Louisiana law. It is undisputed that all of the GDC operators, none of whom were professional engineers, had been trained by Waligora to assess the incinerator logs and control panel prior to disconnecting power to the system. We acknowledge that the actions taken by Waligora could not have been performed by an individual not trained to operate the incinerator. It is clear, however, that the actions taken by Waligora could have been performed by individuals who had neither engineering training, nor the ability to exercise special

13

judgement unique to the field of engineering. We conclude, from the facts of the case, that the actions taken by Waligora were not engineering services and, therefore, fall outside the scope of the Professional Liability exclusion contained in the CGL policy. See e.g. Abramson, 908 F. Supp. at 1394-94 (applying Louisiana law) (finding that professional liability exclusion did not apply because there was no evidence demonstrating that the removal and replacement of pipeline covering required the special training of an engineer or the exercise of his professional judgment).

Scottsdale contends that in the event the actions taken by Waligora were not professional services, by application of the prior decision of this Court in Natural Gas Pipeline Co. of America v. Odom Offshore Surveys, Inc., 889 F.2d 633 (5th Cir. 1989), coverage under the CGL policy is nevertheless excluded. In that case, Odom Offshore Survey, Inc. ("Odom") was hired by Natural Gas Pipeline Company of America ("NGPL") to survey a pipeline and plot proposed anchor locations to be used to guide a dive vessel over designated pipeline locations. Two Odom employees were to use data generated by a Hydrotrac computer system to facilitate placement of the anchors in such a manner as to not damage the pipeline. The employees directed the positioning of four anchors, one of which collided with the pipeline causing serious damage. The district court found that the employees of Odom were negligent in the manner in which the anchors were positioned but, as the employees were performing surveying services at the time the anchors were

14

positioned, the property damage resulting from their negligence was excluded from coverage under a professional liability exclusion contained in the insurance policy.

We find Odom distinguishable on its facts. First, in Odom there was a substantial amount of evidence to show that the services being performed by the Odom employees were of the type "generally recognized as surveying services." Id. at 635. By the facts before us, we have already concluded that the actions taken by Waligora were not professional engineering services. Second, in Odom we found that because the damage to the pipeline arose from the performance of professional surveying services Odom had contracted to perform for NGPL, the actions taken by the Odom employees were within the category of "professional services." We acknowledge that under the sales agreement entered by GDC and TPST, the latter was obligated to provide engineering services including the design, development, manufacture and delivery of a system to incinerate wastes. The sales agreement also required TPST to furnish non-engineering services including the placement of two lead operators, neither of which was required to be an engineer, at the Rubicon plant in part to train GDC operators to operate the incinerator. The facts show that the actions taken by Waligora were not required to satisfy the engineering portion of the sales agreement as, at the time the actions were taken, he was not in the process of designing, developing, or otherwise acting within the course of the practice of his engineering profession on behalf of

15

TPST. We conclude that Waligora's acts of assessing the incinerator system prior to disconnecting power to the control panel and disconnecting the power were not professional engineering services which would implicate application of the Professional Liability exclusion. Accordingly, we reverse the decision of the magistrate judge that the Professional Liability exclusion barred recovery under the CGL policy.

### III. Conclusion

We hold that neither the Contractual Liability exclusion nor the Professional Liability exclusion contained in the CGL policy at issue in this case apply to bar coverage on the claims asserted by Appellants. We REVERSE the decision of the district court and REMAND this case for entry of judgment against Scottsdale for reasonable attorneys' fees and expenses due under this policy.