United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 7, 2004**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 03-30697

_____

BOLLINGER SHIPYARDS LOCKPORT, L.L.C.; ET AL,

Plaintiffs,

BOSTON OLD COLONY INSURANCE COMPANY,

Plaintiff-Appellant,

VERSUS

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
m H-01-CV-708

_____

Before GARWOOD, HIGGINBOTHAM, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Bollinger Shipyards Lockport, L.L.C. ("Bollinger"), a party in the district court but not a combatant in this appeal, was contracted by the Army to build cargo barges. Bollinger sub-contracted AmClyde Engineered Products, Inc. ("AmClyde"), to fabricate and install a cargo crane on one of those barges, the D/B SPRINGFIELD.

Pursuant to the subcontract, AmClyde named Bollinger as an Assured under its Builder's All Risk Policy, with appropriate re-muneration to be paid to the insurer, Certain Underwriters at Lloyd's, London and/or In-stitute Companies ("Lloyd's"). Coverage also was extended under a Commercial General Li-ability ("CGL") policy issued by Lloyd's.

Bollinger handed over the SPRINGFIELD to AmClyde, which duly installed the crane on the barge at its facility in Slidell, Louisiana. Possession of the barge then was returned to Bollinger, which contracted for tugboats to transport it to Newport News, Virginia, for delivery to the Army.

The crane and its associated operator's house snapped off the barge during transit and fell overboard. The accident apparently did not result in damage to the barge, apart from the $1.2 million loss of the crane itself. Boston Old Colony Insurance Company ("Boston Old Colony"), with which Bollinger had contracted specifically to insure the trip, was left re-sponsible for payment to Bollinger to the ex-tent of $900,000.

Bollinger and Boston Old Colony sued Lloyd's, alleging that the Builder's All-Risk Policy and CGL policy required that Lloyd's cover the loss. On Lloyd's' motion for summary judgment, the district court found that the losses fell outside the coverage of the Builder's All Risk Policy and the CGL policy. The district court accordingly dismissed all claims of Bollinger and Boston Old Colony against Lloyd's. Only Boston Old Colony appeals.

I.
We review the district court's legal conclusions, including its interpretation of contracts, *de novo*. *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001); *Nolan v. Golden Rule Ins. Co.*, 171 F.3d 990, 992 (5th Cir. 1999). In reviewing a summary judgment, we view any reasonably disputable facts in the light most favorable to the non-moving party, in this case Boston Old Colony.

The insurance policies are governed by Louisiana law, under which we utilize the gen-eral rules of contract interpretation, requiring determination of the common intent of the parties. *See Thermo Terratech v. GDC En-viro-Solutions, Inc.*, 265 F.3d 329, 334 (5th Cir. 2001). The intent of the parties as reflected in the words of the policy determines the proper extent of its coverage. *Id.*

The first question is whether the Builder's All-Risk Policy extended coverage to the loss of the crane. That policy is a one-size-fits-all document, intended to apply to the numerous projects AmClyde might pursue. AmClyde

* Pursuant to 5TH CIR. R. 47.5, the court has de-termined that this opinion should not be published and is not precedent except under the limited cir-cumstances set forth in 5TH CIR. R. 47.5.4.

could pay Lloyd's to have additional projects covered by the policy, with its clients named as "additional assureds." Its provisions, then, were not specially crafted to reflect the tasks associated with the installation of the crane on the SPRINGFIELD, but instead were of a more general nature.

Among the Builder's All-Risk Policy's provisions was the following:

> Insurance hereunder in respect to each part, item, or portion of the subject matter(s) of this insurance shall attach from the time of beginning at the risk of an Assured where that insurance becomes the responsibility of the named Assured and continued thereafter until completion of the *entire project* under the contract(s) or agreement(s), and acceptance by client and/or customer and/or as per contract(s), or agreement(s).

(Emphasis added.) In other words, the coverage ended when the "entire project" was completed.

Lloyd's argues that the entire project was completed with the return of the SPRINGFIELD to Bollinger and before the loss of the crane during the delivery trip. Boston Old Colony contends that "entire project" should be read to refer not to AmClyde's whole contract work for Bollinger, but rather to the work to be done under the entire prime contract. Under Boston Old Colony's view, coverage under the Builder's All-Risk Policy would have ceased only when the Army accepted the SPRINGFIELD and only after the loss of the crane.

The district court, reasoning that the Build-er's All-Risk Policy should be read in the factual context of the subcontract that required its application, concluded that the "entire project" language referred only to the work done under the AmClyde subcontract. The court noted especially that the subcontract provided that risk of loss was intended to shift from AmClyde to Bollinger on return of the barge to the latter. The subcontract stated:

> SUPPLIER [AmClyde] shall provide Builder's All Risk Insurance for 100% replacement cost for all PURCHASER [Bollinger] supplied equipment while said equipment is in the possession of SUPPLIER [AmClyde]. Risk of loss shall pass on delivery of this LSB-18 Crane to PURCHASER [Bollinger].

The parties thus contemplated that the insurance yet to be provided by AmClyde would lapse after the SPRINGFIELD was returned to Bollinger. It is in light of these circumstances that the district court interpreted the contract's "entire project" language to mean only the work performed under the subcontract.

Boston objects to the district court's reference to the subcontract in interpreting the Builder's All Risk Policy. As Boston Old Colony correctly notes, the language of the subcontract cannot overwhelm or defeat the plain language of the insurance contract. *See Saavedra v. Murphy Oil USA, Inc.*, 930 F.2d 1104, 1110 (5th Cir. 1991). But the district court did not act improperly by looking to the circumstances surrounding the inclusion of Bollinger as an additional assured under the Builder's All Risk Policy. Indeed, it is impossible to interpret the policy in any fashion without looking to surrounding circumstances, for its terms are almost wholly generic.

3

Further, the existence and nature of the subcontract are among the most important circumstances relevant to the interpretation of the policy. It was no error for the district court to look to the subcontract in concluding that the likely meaning of "entire project" under the policy was limited to the completion of work under the subcontract. The court's reference to other circumstances surrounding the policy, such as its price and the typical extent of builder's all risk policies as a species, was likewise appropriate.

In addition to its criticism of the district court's use of the subcontract, Boston Old Colony points to language in the policy that Boston Old Colony contends supports its interpretation of "entire project." Primarily, Boston Old Colony points to provisions in the policy that it says support its view that the policy extends coverage for the duration of the prime contract. The provisions Boston Old Colony cites, however, are illustrative only of the contract's wide expansive coverage, *not* of its temporal extent.

For instance, Boston Old Colony notes that the policy explicitly extends its coverage to "prefabrication and/or fabrication and/or erection and/or construction and/or installation and/or repairs and/or remodeling and/or movements by any means (including ocean transits by steamer(s) and/or motor vessels(s) and/or barge(s) in tow)." This generic language underscores the intended effect of the contract to cover damages resulting from all manner of activities in which AmClyde might engage while undertaking its work. The "Delivery Trip" language was not added in contemplation of the voyage of the SPRING-FIELD from Louisiana to Virginia, but rather to encompass any and all "transits" of a covered item from one place to another.

The delivery trip of the SPRINGFIELD was very short, as the parties elucidated at oral argument, only from AmClyde's facilities to the custody of towing vessels contracted by Bollinger, just outside of Slidell. For that matter, there was evidently no "remodeling" or "repairs" planned or undertaken as part of AmClyde's work under the subcontract—the language is included merely to note the many circumstances covered by Lloyd's' generic and widely applicable Builder's All Risk Policy. The "Delivery Trip" language cannot be read to suggest that the "entire project" language was intended to cover events after the completion of AmClyde's own subcontract.

Similarly, language in the Policy noting that the coverage of the policy extended "worldwide" (with exceptions for icy ports of call) is evidence neither that AmClyde expected to move the SPRINGFIELD across the Seven Seas, nor that the Louisiana-to-Virginia trip was covered by the contract. Again, evidence of the policy's expansive spatial coverage is not probative of its temporal extent.[1]

Boston Old Colony's arguments are unconvincing, and, as the district court observed, the nature of the Builder's All Risk Policy and the circumstances surrounding its extension of coverage to Bollinger as an additional assured support the conclusion that coverage ended at the completion of AmClyde's "entire project" under the subcontract.

---

[1] Boston Old Colony notes that under Addendum 21 of the Builder's All Risk Policy, a maintenance risks clause may extend coverage of the Builder's All Risk Policy for up to a year. There is, however, no evidence to show that any such extension was exercised.

## II.

Boston Old Colony also asserts, separately from its arguments concerning the Builder's All Risk Policy, that the CGL policy should have provided coverage of the loss of the crane and pilot house. It is undisputed that the temporal coverage of the CGL policy extended past the handover of the SPRINGFIELD. Its express terms, however, included exclusions that prevent the loss of the crane from coverage under the policy.

The relevant exclusions were the "faulty workmanship" exclusion, also known as the "business risk" exclusion, and the "professional services" exclusion. The district court concluded that these exclusions placed outside the coverage any damages to the crane itself, where they resulted from poor work by either AmClyde's skilled laborers or its professional staff. They function to leave the risk of replacing or repairing defective materials as a commercial risk of the purchaser. In other words, they prevent a commercial liability policy from becoming a product or service warranty.

Inasmuch as the loss of the crane may be, as Boston Old Colony alleges, the result of faulty welding and other bad work by Am-Clyde's blue collar employees, the loss falls under the "faulty worksmanship" exclusion. Because loss of the crane was the result of poor design by AmClyde's engineers, as Boston Old Colony alternatively contends, the loss falls under the "professional services" exclusion.

Boston Old Colony also argues that a separate "Architects / Engineers Professional Liability Policy" was added to the CGL policy, but Boston Old Colony cannot show where within the contract such an addendum actually appears. A heading concerning such a policy appears in the table of contents but was expressly "subject to full wording to be agreed to by Underwriters of the Assured." Because such an addendum was never agreed upon, it is not now a part of the contract. The "professional services" exclusion must apply with full force.

The CGL policy would have acted to cover damage that the destruction of the crane caused to other parts of the SPRINGFIELD, but it cannot cover the failure of the crane. Boston Old Colony has not alleged that the loss of the crane damaged other parts of the SPRINGFIELD.

AFFIRMED.

5