**NATURAL GAS PIPELINE COMPANY OF AMERICA, etc., et al., Plaintiffs–Appellants,**

v.

**ODOM OFFSHORE SURVEYS, INC., Defendant–Appellee,**

v.

**SUBSEA INTERNATIONAL, INC., et al., Third–Party Plaintiffs Defendants–Appellants,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Third–Party Defendant–Appellee.**

No. 88–3812.

United States Court of Appeals, Fifth Circuit.

Dec. 6, 1989.

James R. Sutterfield, Campbell E. Wallace, James R. Holmes, Hoffman, Sutterfield, Ensenat & Bankston, A.P.L.C., New Orleans, La., for Natural Gas Pipeline Co.

Michael J. Maginnis, David L. Barnett, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., for National Union Fire Ins. Co.

Before CLARK, Chief Judge, THORNBERRY and GEE, Circuit Judges.

CLARK, Chief Judge:

## I.

Natural Gas Pipeline Company of America ("NGPL") appeals the decision of the United States District Court for the Eastern District of Louisiana denying coverage for Odom Offshore Surveys, Inc. ("Odom") under a general liability insurance policy containing a professional liability exclusion which Odom had purchased from National Union Fire Insurance Company of Pittsburgh ("National Union"). We affirm.

## II.

In November, 1981, NGPL was in the process of laying a twelve-inch pipeline on the floor of the Gulf of Mexico. A subcontractor of NGPL hired the vessel M/V MR. OFFSHORE to provide support services for divers working on the pipeline. NGPL hired Odom to survey the pipeline and the surrounding ocean bed, "to plot the pipeline and proposed anchor locations [for the M/V MR. OFFSHORE], and to guide the dive vessel over designated anchor and pipeline locations during anchoring and anchor retrieval operations." *Natural Gas Pipeline v. Odom Offshore Surveys, Inc.*, 697 F.Supp. 921, 923 (E.D.La.1988). NGPL plans called for the M/V MR. OFFSHORE to anchor directly over a certain tap valve on the sea floor. Divers from the ship were then to connect the NGPL pipeline into the tap valve. The M/V MR. OFFSHORE was equipped with a four-point mooring system which dropped 5000 pound anchors, one fore and one aft, from the starboard side of the ship and similar fore and aft anchors from the port side of the ship. By dropping one anchor at each of four points calculated by Odom's employees with reference to Odom's survey and by controlling the amount of anchor line allowed to each anchor, Captain Green-

halgh of the M/V MR. OFFSHORE could hold his ship at a precise location over the tap valve.

To facilitate the positioning of the anchors, Odom placed two employees, Quarles and Chamblee, on the M/V MR. OFFSHORE with a "Hydrotrac" computer system. Other Odom employees had previously surveyed this section of the ocean floor, including the location of the NGPL pipeline, and had programmed this information into the Hydrotrac. By reading the screen of the Hydrotrac and the mylar plotting sheets produced by the computer, Quarles and Chamblee could direct the captain in positioning the anchors so that the pipeline would not be damaged by the anchors, and the vessel would be held directly over the tap valve. Captain Greenhalgh instructed Quarles and Chamblee to direct him in dropping the anchors no closer than 500 feet from the pipeline. Using the Hydrotrac, Quarles and Chamblee directed the positioning of the four anchors.

Four days after anchoring, the M/V MR. OFFSHORE began experiencing heavy weather, and the captain received permission to retrieve the anchors. After retrieving the port stern anchor without incident, the captain experienced difficulty retrieving the starboard stern anchor. Ultimately, Captain Greenhalgh ordered the anchor cable cut and the M/V MR. OFFSHORE proceeded to port, leaving the starboard stern anchor where it lay.

On December 4, 1981, divers discovered that the starboard stern anchor, having collided at some point with the NGPL pipeline, had seriously damaged the pipeline. A trench ran from the anchor's position in the pipeline to a crater six to ten feet from the pipeline. NGPL then sued Odom for negligence in directing placement of the anchor. Odom filed a Chapter 11 bankruptcy petition, and the automatic stay in bankruptcy was lifted to permit NGPL to pursue the suit for any insurance proceeds which might be available. Odom defended by stating that Captain Greenhalgh had been negligent in retrieving the anchors.

The district court found that the negligence of Odom employees caused the an-

chor to be placed incorrectly, thus causing damage to the pipeline. The court did not specify whether the negligence of the Odom employees occurred in incorrectly programing the survey information into the Hydrotrac or in incorrectly reading the information later supplied by the Hydrotrac. Odom's argument that the damage was caused by Captain Greenhalgh's negligence in attempting to retrieve the anchor was dismissed by the court in light of expert testimony to the contrary.

The district court then held as a conclusion of law that because Odom's negligence arose out of surveying activities, any damage caused by that negligence was not covered under Odom's comprehensive general liability policy with National Union. That policy contained an "Architects, Engineers and Surveyor's Professional Liability Exclusion" reading:

> This insurance does not apply:
>
> (b)(1) if the insured is an architect, engineer or surveyor, to bodily injury or property damage arising out of professional services performed by such insured, including
>
> (i) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and
>
> (ii) supervisory, inspection or engineering services.

Accordingly, the district court awarded NGPL and the other plaintiffs $2,570,000 in damages plus prejudgment interest against Odom, but held that National Union, as Odom's insurer, was not responsible for the damages. NGPL then perfected this appeal.

### III.

NGPL raises only one issue here: the denial of liability coverage for Odom's negligence under the National Union comprehensive general liability policy. NGPL argues that because Quarles and Chamblee were not surveyors but were merely employees whom Odom had trained to operate a computer system and to read the map it produced, the negligent actions of Quarles and Chamblee are not excluded from cover-

age by the "Architects, Engineers and Surveyors Professional Liability Exclusion" in the National Union policy. The services performed by Quarles and Chamblee, NGPL states, were navigation services instead of survey services. Secondly, NGPL argues that the acts which Quarles and Chamblee performed on the M/V MR. OFFSHORE were not "professional acts" and that the policy exclusion applies only to damages arising out of "professional services performed."

### A. Surveying or Navigating?

■ The district court made a finding of fact that the duties performed by Quarles and Chamblee were surveying services. We will reverse this decision only if it is clearly erroneous. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). The district court was presented with ample evidence on which to base its decision. The court stated:

> Quarles testified that he needed to be trained as a surveyor to operate Odom's equipment. Chamblee also had special training for the tasks he performed for Odom on the M/V MR. OFFSHORE. According to Quarles, neither performed any navigational function while they were on the vessel.

697 F.Supp at 926. Additionally, every witness except one who testified on the subject stated that the services performed by Quarles and Chamblee were generally recognized as surveying services. The district court's decision is not clearly erroneous.

Also, because Odom Offshore Surveys, Inc. was the "named insured" under the National Union policy, and because that term in this policy did not extend coverage to individual employees of Odom, the exclusion was properly applied to all acts of Odom which caused damage "arising out of professional services performed by such insured." The policy states the following:

> Each of the following is an *insured* under this insurance to the extent set forth below:
>
> (c) if the named insured is designated in the declarations as other than an indi-

vidual, partnership or joint venture, the organization so designated and any executive, officer, director or stockholder thereof while acting within the scope of his duties as such.

No provision in the policy states that employees of the insured corporation are "insureds." Again, the pertinent exclusion states that the insurance will not apply "if the *insured* is an architect, engineer or surveyor, to bodily injury or property damage arising out of professional services performed by such *insured* ..." (emphasis supplied). According to the policy definition, the insured was Odom Offshore Surveys, Inc., not Quarles or Chamblee. The pivotal questions as to the application of the exclusion thus become whether Odom itself was a surveyor and whether the damage to the pipeline arose out of Odom's rendering of professional services. If Quarles and Chamblee individually did not render surveying services by operating the Hydrotrac and by directing the placement of the anchors, then their actions formed one part of the package of surveying services offered and performed by Odom.

B.  Professional Services?

■  NGPL argues that the services performed by Quarles and Chamblee were not "professional services," and that the exclusion does not apply for that reason. The district court stated:

In directing the M/V MR. OFFSHORE to designated proposed anchor locations, Quarles and Chamblee were required to exercise professional judgment, derived from special training. Accordingly, the court finds as a matter of law that the services rendered by the Odom survey crew on board the M/V MR. OFFSHORE were professional services within the meaning of National Union's exclusions.

697 F.Supp. at 928 (citations omitted).

Because we read National Union's policy to consider Odom, rather than Quarles and Chamblee, as the policy insured, we concentrate on the actions of Quarles and Chamblee within the context of Odom's complete provision of services to the NGPL project in determining whether the damage to the NGPL pipeline arose out of professional services. To segregate the actions of Quarles and Chamblee in operating the Hydrotrac system from the complete array of Odom services which made use of the Hydrotrac system possible, i.e., the survey of the seabed, the plotting of the NGPL and other pipelines onto the survey map, and the programming of the Hydrotrac with this information, would violate a plain reading of the insurance policy language. We find that the actions of Quarles and Chamblee easily fall within the "professional services" category and that the damage to the NGPL pipeline arose from the performance of services Odom had contracted to perform for NGPL.

As the district court noted, this contract is governed by Louisiana law. 697 F.Supp. at 927. *See Sprow v. Hartford Insurance Co.*, 594 F.2d 418, 421 (5th Cir.1979). Our decision accords with Louisiana's broad definition of "professional services": "Professional services, in its usual connotation, means services performed by one in the ordinary course of the practice of his profession, on behalf of another, pursuant to some agreement, express or implied, and for which it could reasonably be expected some compensation would be due." *Aker v. Sabatier*, 200 So.2d 94, 97 (La.Ct.App. 1967), *cited with approval in Jensen v. Snellings*, 841 F.2d 600, 613 (5th Cir.1988). The district court found that the NGPL–Odom contract called for Odom to provide both the survey of the ocean floor and the interpretation and translation of that information into correct anchor placements. The failure to perform either of these tasks constituted a failure by Odom to competently perform the professional services required by the contract. Thus, for their part within the full scope of Odom's contractual duties, the actions of Quarles and Chamblee in directing the anchor placements constituted "professional services."

IV.

The judgment of the district court is AFFIRMED.