REVISED SEPTEMBER 24, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-30640
_____

CORY DALTON COCHRAN

              Plaintiff - Appellant

        v.

B J SERVICES CO USA; ET AL

              Defendants

DRILLMARK CONSULTING INC

              Defendant - Appellant

NABORS DRILLING USA INC

              Defendant-Intervenor Plaintiff - Appellant

        v.

MID-CONTINENT GROUP

              Defendant - Appellee
_____

Appeals from the United States District Court
for the Western District of Louisiana
_____
August 16, 2002

Before KING, Chief Judge, and HIGGINBOTHAM and EMILIO M. GARZA,
Circuit Judges.

KING, Chief Judge:

    Plaintiff-Appellant Cory Cochran sought recovery on his

personal injury negligence suit under an insurance policy issued

to Defendant-Appellant Drillmark Consulting, Inc. by Defendant-Appellee Mid-Continent Group.  Cochran appeals the district court's summary judgment in favor of the insurance company.  For the following reasons, we REVERSE and REMAND.

## I.   FACTUAL AND PROCEDURAL HISTORY

Defendant-Appellant Drillmark Consulting, Inc. ("Drillmark"), Defendant-Appellant Nabors Drilling USA, Inc. ("Nabors"), and Defendant B.J. Services Co. U.S.A. ("B.J. Services") all contracted with Union Pacific Resources Company ("UPR") to perform various functions on an oil drilling operation.  Defendant-Appellee Mid-Continent Group ("Mid-Continent") contracted with Drillmark to provide insurance for some of Drillmark's obligations arising from the UPR drilling operation.  Drillmark contracted with UPR to supervise the UPR site overall and to report back to UPR regarding the work of other contractors.  Drillmark assigned Roy Springfield to be the overall supervisor on the UPR site.  In the vernacular of drilling operations, Springfield was the "company man."

On July 5, 1997, Plaintiff-Appellant, Cory Cochran, a derrick hand employed by Nabors, was injured while removing a cement head owned by B.J. Services from the head's casing on top of the drilling rig.  Cochran filed a personal injury suit alleging negligence against, <u>inter</u> <u>alia</u>, B.J. Services, Nabors, UPR, and Drillmark.  Drillmark supervisor Springfield was not

present at the scene of Cochran's accident with the cement head. Cochran alleged that Springfield's absence constituted a failure to supervise by Drillmark that caused Cochran's injury.

Cochran later added Mid-Continent as a defendant, seeking recovery from the insurer pursuant to the insurance contract between Mid-Continent and Drillmark, which contract provided for defense and indemnification of Drillmark by Mid-Continent for any covered obligations.[1]  Mid-Continent denied Drillmark coverage for obligations arising from Cochran's suit based on a provision within the Mid-Continent-Drillmark policy that excludes coverage for any obligations arising due to Drillmark furnishing "professional services" on the UPR operation.  On June 19, 2000,

---

[1]   UPR, Drillmark, and Mid-Continent were added as defendants in amended complaints.  A Mid-Continent subsidiary, Mid-Continent Casualty Company, was the Mid-Continent entity originally added as a defendant.
The parties are not clear as to whether only indemnification or also defense is the subject of this appeal.  Cochran's amended complaint naming Drillmark as a defendant appears to pray for both indemnification and defense by requesting "all damages to which [Cochran] is entitled to receive ... from the date of judicial demand and for all costs of these proceedings .... and for all general and equitable relief."  The insurance policy issued by Mid-Continent entitles insured Drillmark to "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury'" and provides for Mid-Continent's "right and duty to defend the insured against any 'suit' seeking those damages."  Mid-Continent asserts that defense is not a subject of this appeal, only indemnification, and that Mid-Continent is already providing defense.  The record on appeal and the district court's decision fail to clarify this point.  Because the only issue we determine on appeal is that the exclusion at issue here does not, as a matter of law, apply to exclude coverage by Mid-Continent in this case, any issue with respect to the duty to defend is not material to our determination on appeal.

Mid-Continent moved for summary judgment claiming no liability under the policy it issued to Drillmark. On August 9, 2000, based on the district court's finding that the professional services exclusion applied to Drillmark's alleged failure to supervise removal of the cement head, the district court granted summary judgment in favor of insurer Mid-Continent. Cochran, Nabors, and Drillmark (collectively, the "Appellants") timely appeal that summary judgment.[2]

## II. STANDARD OF REVIEW

This court reviews summary judgment de novo, applying the same standards as the district court. Chaney v. New Orleans Pub. Facility Mgmt., Inc., 179 F.3d 164, 167 (5th Cir. 1999). Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## III. MID-CONTINENT'S OBLIGATION TO PROVIDE COVERAGE TO DRILLMARK

The district court applied Louisiana law to hold that the professional services exclusion provision in the Mid-Continent-Drillmark insurance contract released Mid-Continent from any insurance liability arising from Cochran's suit as a matter of law.[3] In deciding cases governed by state law, we are bound by

---

[2] B.J. Services does not appeal the summary judgment.

[3] Defendant-Appellant Drillmark argues in the alternative that the district court erred in applying Louisiana law and that Texas law governs this case so that, under Texas law, Mid-

4

applicable decisions of the state's highest court.  See, e.g., Gaia Techs. Inc. v. Recycled Prods. Corp., 175 F.3d 365, 375 n.11 (5th Cir. 1999) (citation omitted).  The Louisiana Supreme Court has yet to interpret the scope of the precise type of professional services exclusion provision implicated in this case in like circumstances.  In the absence of a decision on point by the Louisiana Supreme Court, we must ascertain how that court would rule if faced with the interpretation of the scope of the Mid-Continent-Drillmark provision.  See id.  To accomplish that task, we may look for guidance from decisions by Louisiana intermediate appellate courts, see id., and decisions by federal courts applying Louisiana law.  See State Farm Mut. Auto. Ins. Co. v. Coviello, 233 F.3d 710, 713 (3d Cir. 2000) (citation omitted); Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir. 1999) (citation omitted).

The professional services exclusion provision within the Mid-Continent-Drillmark insurance contract reads in relevant part:

---

Continent owes coverage to Drillmark.  Drillmark makes this argument for the first time on appeal, and thus we are entitled to disregard it on that ground alone.  See, e.g., Employers Ins. of Wausau v. Occidental Petroleum Corp., 978 F.2d 1422, 1430 n.8 (5th Cir. 1993) (A "party has an obligation to call the applicability of another [forum's] law to the court's attention in time to be properly considered.") (quotation omitted). Moreover, because we agree with Drillmark's asserted interpretation of its contract with Mid-Continent under Louisiana law, we find it unnecessary to address this argument.

> EXCLUSION - ENGINEERS, ARCHITECTS OR SURVEYORS
> PROFESSIONAL LIABILITY .... This insurance does not
> apply to "bodily injury", "property damage" ... arising
> out of the rendering of or failure to render any
> professional services by [Drillmark] or any engineer,
> architect or surveyor who is either employed by
> [Drillmark] or performing work on [Drillmark's] behalf
> in such capacity. Professional services include: 1.
> The preparing, approving, or failure to prepare or
> approve maps, shop drawings, opinions, reports,
> surveys, field orders, change orders or drawings and
> specifications; and 2. Supervisory, inspection,
> architectural, or engineering activities.

(emphasis added). As one Louisiana appellate court recently reiterated, such exclusion provisions are common to so-called commercial or comprehensive general liability insurance contracts (known as "CGL" insurance) such as the contract between Mid-Continent and Drillmark. See Smith v. Travelers Prop. Cas., 35,695 (La. App. 2 Cir. 2/27/02), 811 So.2d 1097, 1101. Such provisions reflect the fact that insured professionals, such as engineers, on drilling operations for example, ordinarily carry special insurance separate from the CGL policy to cover obligations arising from the rendering of professional services. See id. (citing McCarthy v. Berman, 95-1456 (La. 2/28/96), 668 So.2d 721).

As the Appellants correctly point out, the district court erred by stating that courts applying Louisiana law construe these exclusion provisions "broadly." Rather, it is well-settled Louisiana law that all insurance contract exclusion provisions are construed "'strictly ... against the insurer, and any

6

ambiguity is construed in favor of the insured.'" Id. at 1100 (quoting Ledbetter v. Concord Gen. Corp., 95-0809 (La. 1/6/96), 665 So.2d 1166, 1169) (internal citation omitted). "However, the rule of strict construction does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists." Id. at 1100-01 (quoting Ledbetter, 665 So.2d at 1169) (internal quotation and citation omitted). It is also well-settled Louisiana law that the insurance provider has the burden of proving that an exclusion unambiguously applies. See, e.g., Arnette v. NPC Servs., Inc., 2000-1776 (La. App. 1 Cir. 2/15/02), 808 So.2d 798, 802 (citing Gaylord Chem. Corp. v. ProPump, Inc., 98-2367 (La. App. 1 Cir. 2/18/00), 753 So.2d 349, 352). Moreover, "[s]ummary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded." Smith, 811 So.2d at 1100 (citing Reynolds v. Select Props., Ltd., 93-1480 (La. 4/11/94), 634 So.2d 1180). Consequently, contrary to the district court's portrayal, Louisiana law places a heavy burden on Mid-Continent when that insurer seeks to exclude insureds from coverage via the type of professional services provision at issue in this case, especially on motion for summary judgment.

7

This court has at least twice interpreted the scope of professional service exclusion provisions in insurance contracts, which provisions were materially indistinguishable from the Mid-Continent-Drillmark provision, with contrasting results. See Natural Gas Pipeline Co. of Am. v. Odom Offshore Surveys, Inc., 889 F.2d 633, 636 (5th Cir. 1989) (finding in favor of an insurance company under Louisiana law that a professional services exclusion provision excluded coverage for obligations arising due to allegedly negligent anchor placement by a surveyor on a pipeline operation); Thermo Terratech v. GDC Enviro-Solutions, Inc., 265 F.3d 329, 337 (5th Cir. 2001) (finding in favor of insureds under Louisiana law that a professional services exclusion provision did not exclude coverage for obligations arising due to allegedly negligent removal of a part within a hazardous waste incinerator by the employee of an incinerator design contractor). The district court in this case relied upon our decision in Odom to interpret the meaning of the term "supervisory" -- as it appears in the Mid-Continent-Drillmark exclusion provision -- to include the allegedly negligent action by Drillmark that gave rise to Cochran's suit, specifically failure to supervise removal of the cement head. The district court thus concluded that the provision excluded coverage for any failure by Drillmark to supervise cement head removal. Close examination of Odom, along with our more recent decision in Thermo Terratech, however, indicates that the

district court's interpretation of the scope of the instant exclusion provision is flawed.

In Odom, an insured surveyor contractor was hired to survey a pipeline project and to guide a dive vessel during anchoring operations. 889 F.2d at 634. After an anchor injured the pipeline, the surveyor contractor was sued for negligence. Id. The surveyor's CGL insurance policy included the following professional services exclusion provision, which provision is analogous to the Mid-Continent-Drillmark provision:

> This insurance does not apply: ... if the insured is an architect, engineer or surveyor, to bodily injury or property damage arising out of professional services performed by such insured, including ... the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs, or specifications, and ... supervisory, inspection, or engineering services.

Id. at 635. We rejected an argument that the employees responsible for negligent anchor placement were merely navigating, but not surveying, at the time of the accident. See id. We instead credited testimony that the acts performed were "generally recognized as surveying services." Id. at 635. We also credited testimony relied upon by the district court in that case that the employees of the contractor required training as a surveyor to operate the necessary equipment and to perform the allegedly negligent anchor placement tasks. See id.

In Odom, we further cited to a definition of professional services first set forth by a Louisiana intermediate appellate

court in Aker v. Sabatier, 200 So.2d 94, 97 (La. Ct. App. 1967). See Odom, 889 F.2d at 636. That definition from Aker states that "'[p]rofessional services, in its usual connotation, means services performed by one in the ordinary course of the practice of his profession, on behalf of another, pursuant to some agreement, express or implied, and for which it could reasonably be expected some compensation would be due.'" Id. (quoting Aker, 200 So.2d at 97). Relying on that Aker definition, we interpreted Louisiana law in Odom to require a court to look to the nature of the particular service allegedly negligently provided (or not provided) to determine whether that service was recognized as a professional service of the type included within the category of professional services that the contractor agreed to provide. See 889 F.2d at 636. We also relied on a finding by the district court that the surveyor had contracted "to provide both the survey of the ocean floor and the interpretation and translation of that information into correct anchor placements." Id. We found, therefore, that the contractor's failure in anchor placement "easily fall[s] within the 'professional services' category" of services required under its contract. Id. at 636. We thus concluded that the provision at issue excluded coverage for any suit arising from a failure to properly place the anchor. See id.

In contrast, in our more recent decision Thermo Terratech, we interpreted a professional services exclusion provision in a

10

CGL policy, which provision likewise is materially indistinguishable from the Mid-Continent-Drillmark provision, to find that the provision did not exclude coverage by the insurer. See 265 F.3d at 335-37. In so doing, we distinguished Odom in a manner that is instructive in this case. See id. In Thermo Terratech, an insurer issued a CGL insurance policy to a hazardous incineration job operator. Id. at 333. The incineration job operator hired a contractor to "design, develop, manufacture, and deliver" a portable incinerator to an incineration plant. Id. at 331. An employee of the design contractor, an engineer, was assigned to the plant as a "lead operator[]," and his "primary duty ... was to train the employees of [the incineration job operator] to operate the incinerator." Id. At the request of the incineration job operator, the design contractor employee "disrupted power to the control panel" of the incinerator to facilitate removal of a speed control driver for repair. Id. at 332. By doing so, the employee "thereby disconnect[ed some] recirculat[ion] pumps." Id. A fire in the incinerator "ensued shortly after the power to the control panel was disconnected." Id.

Claims were filed against the design contractor to recover amounts paid in settlement due to the fire based on the allegedly negligent removal of the driver. Id. at 332. The design contractor prevailed, and the suit for repayment of fire damages

11

was dismissed.[4]  The design contractor then filed suit against the incineration job operator to recover attorney fees and costs incurred in defending the claims.  Id. at 333.  As a threshold matter, we determined that the CGL policy held by the incinerator operator in Thermo Terratech, which provided for indemnification and defense to the incinerator operator for obligations arising from the incineration operation, extended to cover obligations owed by the design contractor as well.  See id. at 335.[5]

The CGL insurer in Thermo Terratech claimed, however, that the professional services exclusion provision in the CGL policy in that case excluded coverage for obligations arising due to the removal of the incinerator driver.  Id.  The exclusion provision

---

[4]  A district court's finding that the incineration job operator party to Thermo Terratech owed indemnification to the design contractor for amounts paid due to the fire, pursuant to their design and sales contract, was affirmed on appeal in a separate action in which a third party sought reimbursement for settlement amounts paid.  See 265 F.3d at 333.

[5]  We based that finding on a provision in the Thermo Terratech CGL insurance policy that provided for coverage for obligations owing due to incidental contracts of the incineration job operator, the holder of the insurance policy.  We determined that the contract between the incineration job operator and the design contractor qualified as such an incidental contract so that coverage was owed due to obligations arising from acts of employees of the design contractor.  See Thermo Terratech, 265 F.3d at 335.  Although in the instant case, Drillmark -- as the party accused of negligence and thus the party situated similarly to the design contractor in Thermo Terratech -- is the direct holder of the CGL policy, we find this difference between the circumstances of Thermo Terratech and the instant case to be of no material consequence to our determination.

in <u>Thermo Terratech</u>, which is materially indistinguishable from the Mid-Continent-Drillmark provision, reads in relevant part:

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the rendering of or the failure to render any professional services by or for the name insured, including .... supervisory, inspection or engineering services.

<u>Id.</u> at 333 n.8.

In reversing summary judgment that was granted in favor of the insurer, we noted that under Louisiana law, where an insurance exclusion is susceptible to more than one reasonable interpretation, a court "must adopt the interpretation that provides coverage to the insured." <u>Id.</u> at 334-35 (citing <u>Talley v. Blue Cross Blue Shield of La.</u>, 99-1974 (La. App. 3 Cir. 5/3/00), 760 So.2d 1193, 1195). We further cited to the same <u>Aker</u> definition of professional services relied upon by the district court in this case. <u>See</u> <u>id.</u> at 335-36 (quoting <u>Aker</u>, 200 So.2d at 94) (internal quotation and citation omitted). We then reiterated the test we outlined in <u>Odom</u> that was developed by Louisiana appellate courts for interpretation of the scope of professional service exclusion provisions such as the Mid-Continent-Drillmark provision:

> To determine whether services are professional in nature, we look: [t]o the character of the services performed, such as whether special knowledge and technical expertise are required, rather than the title or character of the party performing the services. Acts which could have been done by an unskilled or untrained employee are not subject to a professional services exclusion. Professional services involve

13

> discretion acquired by special training and the
> exercise of special judgment.

Id. at 336 (internal quotation and citations omitted) (citing Am. Cas. Co. v. Hartford Ins. Co., 479 So.2d 577, 579 (La. Ct. App. 1985), which decision in turn notes that the test was first set forth in D'Antoni v. Sara Mayo Hosp., 144 So.2d 643, 646 (La. Ct. App. 1962)). We interpreted this test, along with the Aker definition, to require that "for the Professional Liability exclusion to apply [in Thermo Terratech], the fire and resulting property damage must have arisen from [the negligent employee's] rendering, or his failure to render, an engineering service." Id.

We then noted that it was "undisputed" in Thermo Terratech "that [some] of the [incineration job operator employees], none of whom were professional engineers, had been trained ... to assess the incinerator logs and control panel prior to disconnecting power to the system" so that "several non-engineer employees had the training necessary to remove the damaged driver." Id. at 332, 336. We found, therefore, that although "the actions taken by [the allegedly negligent design contractor employee] could not have been performed by an individual not trained to operate the incinerator[,] ... [such] actions ... could have been performed by individuals who had neither engineering training, nor the ability to exercise special judgment unique to the field of engineering." Id. at 336. We

14

thus concluded in Thermo Terratech "that the actions taken by [the design contractor employee] were not engineering services and, therefore, fall outside the scope of the Professional Liability exclusion contained in the CGL policy." Id. (citation omitted).

In so concluding in Thermo Terratech, we distinguished Odom on its facts, noting that "there was a substantial amount of evidence [in Odom] to show that the services being performed," specifically anchor placement, "were of the type 'generally recognized as surveying,'" thus constituting professional services for the purpose of the exclusion. Id. at 337 (quoting Odom, 889 F.2d at 635). We then contrasted the circumstance of Thermo Terratech, reasoning that the "facts show that the actions taken" in Thermo Terratech "were not required to satisfy the engineering portion of the [contract] as, at the time the actions were taken, [the employee] was not in the process of designing, developing, or otherwise acting within the course of the practice of his engineering profession on behalf of [the allegedly negligent contractor]." Id. We therefore found that the exclusion did not apply and found in favor of the insured. Id.

In absence of contradictory authority from the Louisiana Supreme Court, we reaffirm our reading of Louisiana law in Odom and Thermo Terratech indicating that when an allegedly negligent service performed by a contractor is not of the type recognized as requiring professional expertise or skill, the type of

15

professional services exclusion provision at issue in the instant case will not operate to exclude coverage under a CGL policy for obligations arising from an insured contractor's performance (or non-performance) of that particular service. We further note that, contrary to the parties' assertions, although such information is relevant to this determination, the title or trade of the insured contractor or its employees, or the contractor's overall job description, is not the determinative factor in this inquiry. Rather, it is the nature of the particular service allegedly negligently performed (or not performed), and whether that service is recognized as requiring specialized training or expertise, that determines whether a professional services exclusion in a CGL policy applies under Louisiana law. See id. at 335-37; see also Smith, 811 So.2d at 1101-02 (relying on Odom to reverse summary judgment to find in favor of an insurer that a professional services exclusion, which enumerated "consulting forester" as one of the excluded professional services, excluded coverage for losses from "identif[ication of] property lines" because that function was "essential" to the contractor consulting forester's business and required specialized training and tools); Harbor Ins. Co. v. Omni Constr., Inc., 912 F.2d 1520, 1523-25 (D.C. Cir. 1990) (relying on Odom and noting that an exclusion provision nearly identical to the Mid-Continent-Drillmark provision "clearly refers to the nature of the service

16

provided, not to the nature of the service provider") (emphasis added).

We find the instant circumstance is more analogous to that of Thermo Terratech than of Odom.  Thus, as in Thermo Terratech, we find in favor of the insured Drillmark that the instant professional services exclusion provision does not release Mid-Continent as a matter of law from covering Drillmark's obligations arising from Cochran's suit.  Although Drillmark is described as a consulting engineering firm by trade in its insurance contract with Mid-Continent, the parties do not dispute that Drillmark was not hired in its capacity as an engineering firm per se on the UPR drilling operation to, for example, design or approve design of any portion of the operation.  Rather, it is undisputed that Drillmark contracted with UPR to be the overall supervisor of "company operated drilling, completion and workover activities" and was charged only with monitoring the progress of other contractors and reporting back to UPR.  As we have previously noted and as the testimony reflects, Springfield was the "company man"[6] on the UPR site.  Springfield, whose absence at the accident Cochran alleges resulted in a failure to supervise causing Cochran's injury, further testified that he is

_____

[6]  This court has repeatedly acknowledged the role of the "well known 'company man'" on drilling operations who typically "monitor[s] the progress of the work of independent contractors" and reports back to the principal, such as UPR. E.g., Zepherin v. Conoco Oil Co., Inc., 884 F.2d 212, 213 (5th Cir. 1989).

17

a non-engineer with a high school education.  Additionally, as the district court noted, undisputed testimony by Drillmark owner Dennis Kruse and Springfield indicated that it was not Drillmark's job to provide, and Springfield did not provide, any instruction, specialized or otherwise, to contractors on how to accomplish any particular job, including cement head removal. Thus, in contrast to the contractors in <u>Odom</u> and <u>Thermo Terratech</u>, Drillmark did not contract to provide any package of professional services, such as engineering or surveying, to UPR.[7] More importantly, as Mid-Continent points out in its brief to this court, undisputed testimony by Kruse and Springfield further indicates that removal of a cement head is a routine task that does not require specialized instructions, and which ordinarily is performed by a cementing or drilling crew including, for example, drillers, derrick hands and roughnecks, which are non-professionals.  It follows that the supervision of (or failure to supervise) cement head removal likewise does not require professional engineering expertise or other expertise of a professional nature.  These undisputed facts lead to the

---

[7]  Mid-Continent asserts that Springfield's job description, including such activities as making daily progress reports, checking mud systems, inspecting equipment, and making sketches of tools, for example, constituted provision of services tantamount to professional engineering, albeit non-degreed.  Even assuming without deciding that Mid-Continent is correct, we nevertheless conclude that the specific service at issue here, supervision of removal of a cement head, was not specialized or engineering in nature within the meaning of this exclusion provision.

18

conclusion, in accord with our decisions in Odom and Thermo Terratech, that any negligent failure by Drillmark's company man Springfield to supervise removal of the cement head does not constitute a failure in the rendering of a professional service by Drillmark within the meaning of the Mid-Continent-Drillmark exclusion provision.

We respectfully disagree with the district court's interpretation of Louisiana law and reliance on this court's citation to the Aker definition of professional services in Odom as the basis for that court's conclusion that all supervisory duties performed (or not performed) by Drillmark on the UPR drilling operation should qualify as professional services because the enumeration of excluded services within the exclusion provision includes the term "supervisory" and because Drillmark contracted to supervise the UPR site. Rather, we conclude that the term "supervisory" within the meaning of the instant exclusion provision excludes coverage only for obligations arising due to supervision of a professional nature, thus applying only to supervision requiring a Drillmark employee's professional or specialized expertise or skill. We further note, were we to interpret the scope of a professional services exclusion provision in a CGL policy issued to the company man charged with overall supervision of a drilling operation as did the district court, and as Mid-Continent urges, such exclusion provisions would virtually swallow the entirety of insurance

coverage available to a drilling operation company man under a CGL. We decline the invitation to interpret the scope of a professional services exclusion provision in that manner. We thus conclude that Mid-Continent owes coverage to Drillmark as provided by the terms of their contract, including defense and indemnification, for all obligations arising from Cochran's personal injury suit based on alleged failure by Drillmark to supervise removal of a cement head.

## IV. CONCLUSION

For the foregoing reasons, the district court's summary judgment in favor of insurer Mid-Continent is REVERSED. We REMAND this case to the district court for further proceedings consistent with this decision.