Footnotes in HTML versions of opinions are designated by superscript “balloons” or boxes (click on 
either for the footnote text) and are not numbered. For an exact copy of the 
opinion, retrieve the Adobe PDF version.
 
IN 
THE SUPREME COURT OF TEXAS
 
════════════
No. 02-0849
════════════
 
Diversicare General Partner, Inc., Diversicare Leasing Corporation, Advocat, Inc., and Texas Diversicare Limited Partnership d/b/a Goliad Manor, 
Petitioners,
 
v.
 
Maria G. Rubio and Mary 
Holcomb as Next Friend of Maria G. Rubio, Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Thirteenth District of 
Texas
════════════════════════════════════════════════════
 
Argued September 24, 2003

            Justice O'Neill, 
joined by Justice Brister and Justice Green, dissenting.
 
            The 
facts of this case are not in dispute: in 1995, an elderly 
Alzheimer’s patient was sexually assaulted by another patient while both 
were under the full-time care of a nursing home. The only question before us is 
whether the injured patient’s claim against the nursing home is more properly characterized as an ordinary negligence 
claim or a health care liability claim. In this case, the pleadings themselves 
did not allege facts establishing which standard should govern the case. During 
trial court proceedings, plaintiff’s counsel suggested that the claim derived, 
at least in part, from the nursing home’s alleged 
failure to properly staff the facility. To the extent that it does, I agree that 
the statute governing health care liability claims applies. I respectfully 
dissent, however, because the petition, liberally construed, alleges a broader 
claim for premises liability.
I
            The 
Legislature enacted the Medical Liability and Insurance Improvement Act (MLIIA) 
in order to reduce the cost of medical malpractice insurance and thereby 
increase patients’ access to health care. Act of May 30, 1977, 65th Leg., R.S., 
ch. 817, § 1.02(b)(1)-(5), 
1977 Tex. Gen. Laws 2039, 2040 (former Tex. Rev. Civ. Stat. art. 4590i, § 
1.02(b)(1)-(5)), repealed by Act of June 2, 
2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. 
Gen. Laws 847, 884. To accomplish these goals, the MLIIA mandates that 
plaintiffs follow certain procedures when bringing health care liability claims 
against physicians or other health care providers — for example, claimants must 
bring suit within two years, and they must file an 
expert report substantiating their claims within 180 days of filing suit. 
Id. 
§§ 10.01, 13.01. The MLIIA also contains limitations on the amount of 
damages recoverable. Id. § 
11.02.
            By 
its terms, the MLIIA imposes these restrictions on any “cause of action against 
a health care provider or physician for treatment, lack of treatment, or other 
claimed departure from accepted standards of medical care or health care or 
safety” that causes injury to a patient. Id. § 1.03(a)(4). We have recognized that the heightened requirements 
applied to health care liability claims may sometimes create an incentive for 
litigants to re-cast a health care liability claim as another type of claim, and 
we have therefore held that courts must look beyond the pleadings to examine the 
nature of the underlying action. MacGregor Med. Ass’n v. Campbell, 985 
S.W.2d 38, 40 (Tex. 1998). 
            Analyzing 
the underlying action is not always an easy task, but it is 
one that courts must undertake with great care; the Legislature’s purpose 
in enacting the MLIIA may be thwarted if courts construe the MLIIA’s definition of “health care liability claim” either 
too broadly or too narrowly. An overly narrow interpretation would render the 
statute ineffective because it would exclude too many suits from the statute’s 
reach and thus hinder the Legislature’s goal of reducing malpractice insurance 
rates. 
            Somewhat 
counterintuitively, however, an overly broad 
interpretation could have the same result. Health care providers, like other 
insured professionals, generally carry two insurance policies: a general 
liability policy that covers ordinary negligence, and a malpractice policy “to 
cover obligations arising from the rendering of professional services.” Cochran v. B.J. Servs. 
Co. USA, 302 F.3d 499, 502 (5th Cir. 2002); see 
also Utica Nat’l Ins. Co. v. Am. Indem. Co., 141 S.W.3d 198, 201 
(Tex. 
2004). If a court determines that a plaintiff’s pleadings 
allege a breach of the applicable standard of care for health care providers, 
then the defense and indemnification expenses will most likely fall under the 
malpractice policy rather than the general insurance policy. See Tex. Ins. Code art. 21.49–3, § 
2(1)(defining “medical liability insurance” as applying to claims “arising out 
of the death or injury of any person as the result of negligence in rendering or 
the failure to render professional service by a health care provider”). Insurers 
therefore face their own litigation incentives: malpractice insurers benefit 
when a claim is characterized as ordinary negligence, 
and general-liability insurers benefit when a claim is characterized as a health 
care liability claim. See Utica Nat’l Ins. Co., 141 S.W.3d at 201 
(addressing a claim in which the general-liability insurer asserted that a 
patient’s injuries arose from the “rendering or failure to render [a] 
professional service”; the patient contracted Hepatitis C from an injection of 
contaminated drugs it failed to adequately secure); see also Harris v. 
Sternberg, 819 So. 2d 1134, 1137 (La. Ct. App. 2002) (addressing a claim in 
which the malpractice insurer asserted that the patient’s injuries arose from 
ordinary negligence; the patient slipped and fell from the doctor’s scale). 
Consequently, the adoption of an overly broad interpretation of “health care 
liability claim” could also hinder the Legislature’s goal of ensuring that 
medical malpractice insurance is available at a reasonable cost: if courts sweep 
even ordinary negligence claims into the ambit of the MLIIA, then malpractice 
insurers may end up covering more of those claims. Malpractice insurance rates 
would then continue to rise as those insurance policies 
are required to cover claims that were not contemplated under the insurance 
contracts.
            This 
Court has recognized the importance of correctly classifying these claims and 
has developed a framework for analysis in these cases. If a claim arises from an 
action that is an “inseparable part of the rendition of medical services,” then 
the MLIIA applies to the claim. Walden v. Jeffery, 907 
S.W.2d 446, 448 (Tex. 1995). Thus, if a plaintiff, in 
order to “successfully prove th[e] claim, . . . must prove a breach of the applicable standard 
of care for health care providers,” then the action arises under the MLIIA — 
regardless of how the litigants choose to characterize it. MacGregor Med. Ass’n, 985 S.W.2d at 40-41 
(holding that a claim that a health care provider failed to properly diagnose 
and treat a patient was a health care liability claim even though the plaintiff 
attempted to characterize it as a DTPA claim arising from the provider’s alleged 
misrepresentation that it would provide “qualified personnel and resources,” and 
“the best health services possible”). However, if the claim is not based upon such a breach, then it is not a health care 
liability claim. Sorokolit v. Rhodes, 
889 S.W.2d 239, 242 (Tex. 1994) (holding that a claim that a physician 
“knowingly breached his express warranty of a particular result” was not a 
health care liability claim because it did not require “a determination of 
whether a physician failed to meet the standard of medical care”).
            Courts 
in other states have applied a similar framework. First, they have tended to 
construe state malpractice statutes as applying only to breaches of the 
professional standard of care. See, e.g., Dorris v. Detroit Osteopathic Hosp. Corp., 594 
N.W.2d 455, 465 (Mich. 1999) (holding that Michigan’s medical malpractice 
statute would apply to a claim raising “questions of professional medical 
management”); Woodard v. Krans, 600 N.E.2d 477, 
488 (Ill. App. Ct. 1992) (holding that “[w]here determining the standard of care 
requires applying distinctively medical knowledge or principles, however basic, 
the plaintiff must comply with [Illinois’s malpractice statute]”). 
Second, they have held that claims not directly tied to the provision of health 
care should be governed by an ordinary negligence 
standard. See Cannon v. McKen, 459 A.2d 196, 201 (Md. 1983) (“Those claims for 
damages arising from a professional’s failure to exercise due care in 
non-professional situations such as premises liability, slander, assault, etc., 
were not intended to be covered under [Maryland’s malpractice act] and should 
proceed in the usual tort claim manner.”); see also Dent v. Memorial 
Hosp., 509 S.E.2d 908, 910 (Ga. 1998) (holding that negligence in the 
decision of “[w]hether to use certain equipment at 
all, what type of equipment to use, and whether certain equipment should be 
available in a specific case” would amount to malpractice, but that “the failure 
to operate equipment correctly or in accordance with a doctor’s instructions or 
to keep certain equipment on hand is only ordinary, not professional, 
negligence”). 
            In 
this case, Ms. Rubio’s pleadings do not clearly establish whether all of her 
claims pertain to breach of the “applicable standard of care for health care 
providers,” MacGregor Med. Ass’n, 985 S.W.2d at 41, or whether some of the claims 
assert a breach only of an ordinary standard of care. Several 
of her allegations could pertain either to general negligence or to 
professional malpractice; for example, she alleges that Diversicare failed to “protect Ms. Rubio from repeated acts 
of sexual abuse and assault by others . . . .” Ms. Rubio’s pleadings do not 
specify what particular acts or omissions led to the assaults. Sadly, it has been recognized that “nursing-home residents and hospital 
patients have been the victims of assault not only by employees but also by 
others, even persons wandering in off the street.” Regions 
Bank & Trust v. Stone 
County Skilled Nursing Facility, 
Inc., 49 S.W.3d 107, 113 (Ark. 2001). Consequently, an assault in 
a residential care facility may arise from any number of negligent acts: failure 
to secure the premises, failure to adequately screen 
personnel, failure to adequately restrain mentally impaired patients, or failure 
to provide adequate nursing services. See, e.g., id.; 
see also Reaux v. Our Lady of Lourdes Hosp., 492 So. 
2d 233 (La. Ct. App. 1986), writ denied, 496 So. 2d 333 (La. 1986) (holding that allegations of assault, rape, and 
battery by a hospital intruder did not fall within Louisiana’s Medical 
Malpractice Act); Eric M. Carlson, Long-Term Care Advocacy 
§ 10.09 (2002). Thus, an allegation that a nursing home failed to protect a 
patient from assault can sound either in medical malpractice or in ordinary 
negligence.
A
            To 
the extent that Ms. Rubio’s causes of action depend on an underlying claim of 
understaffing, I agree that they are governed by the 
MLIIA. Ms. Rubio’s attorneys suggested in the trial court that her claims 
related to the nursing home’s staffing procedures, stating that the “underlying 
cause” of the assault was that the nursing home was “dangerously understaffed.” 
In this Court, the attorneys emphasized at oral argument that the sexual-assault 
claim was “inextricably intertwined with what’s necessary for an Alzheimer 
patient-to-staff ratio” and agreed that their legal argument was based on the premise that “there is no medical judgment 
in determining how much staff is needed for those patients more in need of 
supervision.” 
            This 
premise, however, is incorrect; in fact, a nursing home is 
required by law to use medical judgment in its staffing decisions. 40 Tex. Admin. Code § 19.1001. State 
regulations require that a nursing home offer “sufficient staff to provide 
nursing and related services to attain or maintain the highest practicable 
physical, mental, and psychosocial well-being of each resident, as determined by 
resident assessments and individual plans of care.” Id. The 
“resident assessment” requires the facility to analyze, among other things, the 
resident’s “physical functioning and structural problems,” “psychosocial 
well-being,” and “disease diagnoses and health conditions.” Id. § 
19.801. The “plan of care” must be prepared by “an interdisciplinary team 
that includes the attending physician, a registered nurse with responsibility 
for the resident, and other appropriate staff” and must include “measurable 
short-term and long-term objectives and timetables to meet a resident’s medical, 
nursing, and mental and psychosocial needs that are identified in the 
comprehensive assessment.” Id. § 
19.802. Because a nursing home is required to consider the physical and 
mental-health conditions of each of its residents in determining its staffing 
needs, these decisions simply cannot be made without 
employing medical judgment. 
 
B
            Not 
all of the claims pleaded by Ms. Rubio necessarily related to the allegations of 
understaffing, however. Instead, her pleading also asserted that the facility 
failed to use ordinary care to protect her from a known danger; specifically, 
she pleaded that “[d]efendants were well aware” of the alleged assailant’s 
sexual-assault history and that the facility failed “to take preventive measures 
to avert any reoccurrence.” This allegation, broadly construed, asserts a 
premises liability claim; it does not necessarily require the exercise of 
medical judgment, but could instead be read to support 
a claim that the facility failed to use ordinary care to secure the 
premises.
            Ms. 
Rubio’s premises liability claim is similar to the claims in several other cases 
decided by our courts of appeals. See Healthcare 
Ctrs. of Tex., Inc. v. Rigby, 97 S.W.3d 610, 
616–17 (Tex. App.—Houston [14th Dist.] 2002, pet. denied); Zuniga v. 
Healthcare San Antonio, Inc., 94 S.W.3d 778, 780 (Tex. App.—San Antonio 
2002, no pet.); Bush v. Green Oaks Operator, Inc., 39 S.W.3d 669, 670 
(Tex. App.—Dallas 2001, no pet.); Sisters of Charity of the Incarnate Word, 
Houston, Tex. v. Gobert, 992 S.W.2d 25, 27 (Tex. 
App.—Houston [1st Dist.] 1997, no pet.). The Court today overrules these 
cases “to the extent they hold that the patients’ claims for assault by other 
patients are not health care liability claims.” ___ S.W.3d 
___, ___. I would not overrule these cases; each of the plaintiffs in 
these cases assert claims that extend beyond claims for 
“inadequate care and supervision,” just as Ms. Rubio did in this case. In 
Rigby, for example, there was evidence that a nursing home administrator 
induced a nursing home to accept a sexually violent patient by misrepresenting 
the scope of the patient’s prior acts. Rigby, 97 S.W.3d 
at 615. Deliberate misrepresentation does not involve medical judgment. 
Furthermore, there was evidence that the facility in that case 
knew the attacker had a history of sexual violence and yet failed to take even 
ordinary safety precautions; in that case, I believe the court of appeals 
correctly concluded that the suit was based on “simple negligence in failing to 
take adequate safety measures to protect its residents from a known sexual 
deviant.” Id. 
at 622. 
            Nor 
would I overrule the other cases. In Bush, a patient was assaulted by another patient while under the care of a 
hospital facility; the plaintiff claimed that the facility failed to warn her of 
a known danger. Bush, 39 S.W.3d at 670-71. I 
would not hold that a duty to warn of a known danger on the premises depends on 
medical judgment or skill. In Zuniga, a case with similar facts, the 
plaintiff also brought a premises liability claim that was not limited to 
questions relating to proper treatment but instead asserted that the facility 
“did not provide her a safe environment.” Zuniga, 94 
S.W.3d at 782. Finally, in Gobert, the 
court neither mentioned the MLIIA nor considered whether it would apply to the 
case. Gobert, 992 S.W.2d 
25. 
            Because 
the pleadings in this case did not allege facts establishing whether Ms. Rubio’s 
claims resulted from an alleged failure to provide adequate patient care or 
resulted from an alleged failure to secure the premises, the pleadings did not 
establish whether the claim was a health care liability claim or whether it 
sounded in ordinary negligence. When a plaintiff’s 
pleading does not give “fair and adequate notice of the facts upon which the 
pleader bases his claim,” then the defendant may file special exceptions to 
obtain a more definite statement of the plaintiff’s claim. Roark v. Allen, 633 S.W.2d 804, 810 (Tex. 1982). Here, 
however, the nursing home did not file special exceptions. We have recognized 
that in the absence of such special exceptions, the petition must be “construed 
liberally in favor of the pleader” and that the court “should uphold the 
petition as to a cause of action that may be reasonably inferred from what is 
specifically stated . . . .” Boyles v. Kerr, 855 S.W.2d 
593, 601 (Tex. 
1993). Consequently, I would hold that the petition, construed liberally 
in favor of Ms. Rubio, stated a cause of action for premises liability. See 
Charrin v. Methodist Hospital, 432 S.W.2d 572, 574 
(Tex. Civ. App.—Houston [1st Dist.] 1968, no writ) (“A 
patient accepted by a hospital enjoys the status of an invitee or business 
visitor entitled to the exercise of ordinary care by the hospital to keep its 
premises in reasonably safe condition for the expected use.”). 
II
            I 
also note my disagreement with the suggestion in Chief Justice Jefferson’s concurrence 
that a “safety” claim under the MLIIA need not be 
related to the provision of health care. Instead, I agree with the Court 
that the MLIIA encompasses claims for a “departure from an accepted standard of 
. . . safety” when those claims are directly related to the provision of health 
care, including claims based on “professional supervision, monitoring, and 
protection of . . . patient[s].” ___ S.W.3d at ___. 

            The 
statute in effect at the time this case arose provided that claims “against a 
health care provider or physician for treatment, lack of treatment, or other 
claimed departure from accepted standards of medical care or health care or 
safety” would be governed by the MLIIA. Act of May 30, 1977, 65th Leg., R.S., 
ch. 817, § 1.03(a)(4), 1977 
Tex. Gen. Laws 2039, 2041 (former Tex. 
Rev. Civ. Stat. art. 4590i, § 
1.03(a)(4)) (repealed 2003). The Legislature did not 
provide that the statute governs all claims against a 
health care provider or physician; instead, it limited the statute’s scope to 
claims “for treatment, lack of treatment, or other claimed departure from 
accepted standards of medical care or health care or safety.” Id.
            Chief Justice Jefferson suggests that 
the term “safety” is broad enough to encompass a premises liability claim 
unrelated to the provision of health care. ___ S.W.3d at 
___. I disagree that the term can be read so 
broadly; instead, it must be read in the context of the MLIIA, which was enacted 
to address concerns about health care costs. Tex. Gov’t Code § 311.011 (providing that 
“[w]ords and phrases shall be read in context” 
as well as “construed according to the rules of grammar and common usage”) 
(emphasis added); see also Davis v. Michigan Dept. of Treasury, 489 U.S. 
803, 809 (1989) (noting that it is a “fundamental canon of statutory 
construction that the words of a statute must be read in their context and with 
a view to their place in the overall statutory 
scheme”).
            If 
we follow the dictates of the Code Construction Act and read the term “safety” 
in the context of the statute as a whole, then the natural conclusion is that 
“safety” in this statute means safety as it relates to health care. This 
is the conclusion that has been reached by each of the 
courts of appeals considering the issue; these courts have then analyzed whether 
professional judgment is required to determine the proper standard of safety or 
whether only a general duty of care is implicated. See 
Marks v. St. Luke’s Episcopal Hosp., No. 01-04-00228-CV, 2005 Tex. App. 
LEXIS 1694, at *8 (Tex. App. Houston [1st Dist.] 2005, pet. filed) (noting that, 
in a case where a patient was injured by a broken hospital bed, “[t]he 
underlying nature of his allegations is of an unsafe condition created by an 
item of furniture,” and concluding that “[s]uch a 
complaint relates to premises liability, not health care liability, and is 
governed by the standard of ordinary negligence”); Bush, 39 S.W.3d at 673 
(“Although the Act includes breaches of accepted standards of safety within the 
definition of a health care liability claim, the term ‘safety’ cannot be read in 
isolation. The breach must be of an accepted standard of safety within 
the health care industry.”) (citation omitted); 
Rogers v. Crossroads Nursing Serv., Inc., 13 
S.W.3d 417, 419 (Tex. App.—Corpus Christi 1999, no pet.) (noting that “[o]ne of the rules of 
statutory construction is to construe the entire Act, reading each part of it so 
that one part does not conflict with another and to harmonize its various 
provisions,” and concluding that “the only reasonable interpretation is that a 
departure from accepted standards of safety means safety in the diagnosis, care 
or treatment”).
            The 
Legislature itself has recently indicated that it agrees with our appellate 
courts’ consistent judicial interpretation of the word “safety” in this statute. 
When it recently amended the definition of “health care liability claim,” the 
Legislature clarified that claims falling under the statute must relate to the 
actual provision of health care. Tex. 
Civ. Prac. & Rem. Code § 74.001(a)(13). The statute now provides that all claims “for 
treatment, lack of treatment, or other claimed departure from accepted standards 
of medical care, or health care, or safety or professional or administrative 
services directly related to health care” are included in the definition 
of health care liability claim. Id. (emphasis added). Although I 
believe that the plain language of the former statute 
makes it clear that “safety” was intended to be related to health care, this 
amendment removes any doubt. See Alexander v. 
Alexandria, 9 U.S. 1, 7-8 (1809) (concluding that the subsequent 
amendments of a legislative body may “show the sense in which the legislature 
employed doubtful phrases previously used,” and that courts should accept this 
“legislative sense of its own language” as “a direction to courts in expounding 
the provisions of the law”); see also Red Lion Broadcasting Co. v. FCC, 
395 U.S. 367, 381-82 (1969) (noting that a consistent statutory interpretation 
should be given great weight when a legislative body has not merely silently 
acquiesced to that interpretation, but has actually “ratified it with positive 
legislation”). The Legislature has now enacted positive legislation 
ratifying the courts of appeals’ construction of the term “safety,” and I 
believe we should interpret the term in accordance with this construction. 
III
            I 
agree that the MLIIA would govern a claim that the nursing home failed to properly staff the facility. Because a nursing home is 
required to consider the physical and mental-health conditions of each of its 
residents in determining its staffing needs, staffing decisions cannot be made without employing medical judgment. Similarly, 
any safety claim arising from such staffing decisions would be “directly related 
to health care” and therefore also covered under the 
MLIIA. However, because the plaintiff’s petition also included an allegation 
that the facility failed to use ordinary care to protect her from a known sexual 
offender, it alleged a broader premises liability claim. I therefore 
respectfully dissent.
 
 
__________________________________________
Harriet O’Neill
Justice
 
OPINION DELIVERED: October 14, 
2005