**Opinion issued December 23, 2021**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-21-00131-CV

———————————

**VILLAGE GREEN ALZHEIMER'S CARE HOME, LLC, Appellant**

**V.**

**NORMA GRAVES BY AND THROUGH JAMES GRAVES PURSUANT TO A GENERAL POWER OF ATTORNEY, Appellee**

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-14109**

## O P I N I O N

Norma Graves was mauled by a dog in the lobby of an assisted living facility. Her son sued the facility, Village Green Alzheimer's Care Home, LLC, on her behalf, asserting claims for premises liability and gross negligence. Village Green moved to dismiss the suit, arguing that (1) the claims against it are health care

liability claims and (2) Graves failed to satisfy the statutory requirement of an adequate expert report. The trial court denied the motion to dismiss, and Village Green appealed.

We conclude that this is not a health care liability claim and thus affirm the trial court's order denying Village Green's motion to dismiss.

## Background

Motions to dismiss for failure to file a preliminary expert report, by their nature, come early in the litigation.[1] As we have noted many times, at this early stage, the parties do not have the benefit of full discovery, leaving the pleadings and the contents of the expert reports (if any) as the main sources of information about the claim's underlying facts.[2] For this reason, the below background recitations

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a) (providing a 120-day deadline to file motion to dismiss).

[2] The statute aims to evaluate lawsuits at the onset of litigation—before full discovery—to rule out those that are frivolous. *Curnel v. Houston Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 562 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 502 (Tex. 2015)); *Mangin v. Wendt*, 480 S.W.3d 701, 706, 713 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("The requirement to serve an expert report arises at the outset of litigation and before the opportunity for the plaintiff to engage in significant discovery, including taking oral depositions of the defendants. As such, the statute itself contemplates that the amount and quality of evidence available at the time of drafting the expert reports will be less than that available at trial on the merits or even the summary-judgment stage." (citations omitted)).

come mainly from Graves's petition.[3] What is eventually revealed through discovery and later trial testimony may support or refute these pleading assertions.

According to Graves, Village Green has a history of having unsupervised, aggressive dogs on its premises that goes back to a period before this dog and this plaintiff.

### Marley

In early 2019, a Village Green employee, A. Asgar,[4] found a stray dog and brought it to Village Green to live. The dog was given the name *Marley*. Village Green management allowed Marley to freely roam the lobby area of its premises.

One day, a visiting hospice nurse entered the lobby, and Marley lunged at her face. The nurse managed to shield her face, but Marley bit her on her arm and leg. The nurse required medical treatment for her injuries. The next time she visited Village Green, the nurse saw that Marley was still on the premises. Graves's pleadings do not say what ultimately happened to Marley. For their part, Village Green's pleadings do not mention Marley or that dog-attack.

### Charlie

---

[3] *See St. Luke's Episcopal Hosp. v. Poland*, 288 S.W.3d 38, 40 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (in appeal seeking dismissal under Section 74.351, reciting background facts based on plaintiff's petition).

[4] In one place, the pleadings assert that Asgar is the daughter of Village Green's Director of Operations, Nish Sabir. In another location, the pleadings describe her as Village Green owner's daughter.

Less than a year later, Asgar found another stray dog and brought it to Village Green to live. They named this dog *Charlie*. Like Marley, Charlie was allowed to roam the lobby. She would often lie on the couches in the common area.

In early February 2020, L. Carlen began working at Village Green. On Carlen's first day of work, Charlie ran and jumped on Carlen. Carlen told management that Charlie's behaviors were concerning: Village Green is a residential facility that provides Alzheimer's care to mostly elderly people, and Charlie could knock a frail person down and injure them. Village Green allowed Charlie to continue freely roaming the lobby and common areas despite Carlen's objection.

Later that month, on February 20, Charlie was in the lobby when a resident named Anne approached the dog. Charlie lunged at the woman and bit her on the nose. Village Green staff and management learned of the attack that same day. Charlie continued to have full access to the lobby and other common areas of the premises.

Two days later, another resident, Norma Graves, walked through the same common area and saw Charlie lying on a lobby couch. Graves reached out to pet Charlie. Charlie lunged at her and knocked her to the ground. Charlie did not stop. The dog mauled Graves's face.

Graves was taken to the emergency room where she received many stitches to close more than one gash on her face. She also suffered a large puncture wound that could not be closed because it was too close to her eye.

According to Graves's family members, Village Green was less than forthcoming about what had occurred. At first, Graves's family was told that she had simply fallen. Next, they were told that Charlie had knocked her down. Finally, when the family members were with Graves and could see the wounds on her face, Village Green admitted that Charlie had attacked and bitten her.

Graves's family had not known that a stray dog was living on the Village Green premises. They began looking into the history of the dog and found out about the previous attack on Anne. They also found out that Charlie had injured Graves once before. On February 12—ten days before the mauling—Charlie caused Graves's face to bleed. Village Green had prepared an incident report that referred to Graves's injury as a "skin tear" of unknown origin, but it did not tell Graves's family about the injury or that Charlie caused it. Graves's family only learned of the "skin tear" incident after the mauling incident.

In sum, Graves's family learned that there had been at least two previous incidents of Charlie harming residents, yet Village Green continued to allow Charlie to roam freely on the premises.

Graves's family sought a temporary injunction to preserve video of the dog attack captured by a surveillance video camera mounted in the lobby. The video is not part of the appellate record, but the parties' pleadings describe it as depicting Graves reaching out to pet Charlie on the lobby couch, Charlie lunging at Graves and knocking her down, Charlie attacking Graves's face, and no Village Green staff member being present until after Graves was injured.

Because Village Green immediately argued that this is a health care liability claim, Graves moved for the trial court to rule whether Chapter 74 applies to the facts underlying the claims. After first indicating that Chapter 74's expert-report requirements would apply, the trial court ultimately held that Graves's claims were not health care liability claims, having concluded that caring for people on the premises was independent of housing stray dogs on the same premises.

Village Green appealed.

**Texas Medical Liability Act, Chapter 74**

Before TMLA, we had TMLIIA, which was enacted in 1977 to reduce the cost of medical insurance. *Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009) (per curiam). The TMLA replaced TMLIIA in 2003 and was also focused on medical malpractice insurance. The legislative goal was to "broaden[ ] access to health care by lowering malpractice insurance premiums." *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014). It sought to achieve lower malpractice insurance

premiums by requiring claimants to produce an opinion of a suitable expert early in the litigation, saying that their claims have merit. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). The expected consequences of the preliminary-report requirement were two-fold: first, it would deter frivolous medical-malpractice suits and, second, for those frivolous suits that were filed, it would allow expeditious dismissal before the health care providers incurred discovery and other litigation costs. *See id.*; *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 263 (Tex. 2012) (Section 74.351's expert-report requirement allows for "a preliminary determination designed to expeditiously weed out claims that have no merit"). This, in turn, was supposed to lower medical-malpractice insurance premiums to make health care more available. *See Fredericksburg Care Co., L.P. v. Perez*, 461 S.W.3d 513, 523 (Tex. 2015).

To show that a claim has merit and should not be dismissed, a claimant must, at the outset, produce an opinion from a physician on what the applicable standard of care is, that the health care provider breached that standard of care, and that the alleged negligence of the health care provider proximately caused the plaintiff's injury. *Zamarripa*, 526 S.W.3d at 460. If no medical doctor can be found to opine that the health care provider's breach proximately caused the claimant's injuries, the case is dismissed. *See Kelly v. Rendon*, 255 S.W.3d 665, 679 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (stating that the expert report is "simply a preliminary

7

method to show a plaintiff has a viable cause of action that is not frivolous or without expert support").

Notably, an expert's report is not subject to attack for stating the wrong standard of care. *See Robles v. Pinnacle Health Facilities XV, LP*, No. 14-18-00135-CV 2020 WL 746720, at *6 (Tex. App.—Houston [14th Dist.] Feb. 13, 2020, no pet.) (mem. op.). That a jury might ultimately reject the standard of care suggested by the expert as being too onerous is not a basis for a trial court to reject a Section 74.351 expert report and dismiss a suit. *See Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 200 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

The focus is not on the correctness of the articulated standard but, instead, on whether the claimant was able to secure a qualified physician who would opine, based on her training and experience, that a particular course of action is the standard of care, that the defendant breached the standard of care, and that the breach proximately caused the claimant's injuries. *See Zamarripa*, 526 S.W.3d at 459–60 (noting that expert report must explain "how and why" physician's breach of standard of care proximately caused plaintiff's injury); *see also Kuhn v. Sam*, No. 01-20-00260-CV, 2021 WL 3359171, at *6–9 (Tex. App.—Houston [1st Dist.] Aug. 3, 2021, no pet.) (mem. op.). This is generally stated in terms of "reasonable medical probability." *Acharya v. Gomez*, No. 05-18-00833-CV, 2019 WL 1923213, at *5 (Tex. App.—Dallas Apr. 30, 2019, pet. denied) (mem. op.).

**Whether This is a Health Care Liability Claim**

Chapter 74 defines a "health care liability claim." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). It has three statutory elements:

(1) the claim must be asserted against a doctor or health care provider;

(2) it must pertain to

 (a) treatment,

 (b) lack of treatment, or

 (c) other claimed departure from accepted standards of

  (i) medical care,

  (ii) health care,

  (iii) safety, or

  (iv) professional or administrative services directly related to health care;  and

(3) the alleged departure must proximately cause injury or death to the claimant.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

Village Green argues that this suit pertains to a claimed departure of either safety or health care standards—(c)(ii) and (c)(iii) above. We consider each in turn.

**A. Safety**

Whether the circumstances underlying a claim against a health care provider qualify as a safety claim under the TMLA and thus a health care liability claim that requires an expert report, is a question of law. *Tex. W. Oaks Hosp., L.P. v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012). There have been many cases at the intermediate

and highest appellate courts in which this question has been analyzed and resolved. How the courts have conducted their analysis has changed along the way though. For a time, the varieties of incidents that qualified as safety claims seemed to be broadening without limitation. That changed in 2015 when the Texas Supreme Court decided *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496 (Tex. 2015).

1.     ***Ross* and the creation of a multi-factor test to determine whether an alleged violation of a specific safety standard has a substantive nexus to the provision of health care**

In *Ross*, a woman had accompanied a friend to visit a patient at the hospital. *Id.* at 499. As she was leaving through the hospital lobby, she slipped and fell on a floor that was being cleaned and buffed. *Id.* She sued, asserting a premises liability theory of recovery. The hospital argued that her claim was a health care liability claim because safety standards were implicated. *See id.* The Texas Supreme Court rejected the argument. *See id.* at 503–04.

The Court held that the applicable safety standards Ross alleged the hospital violated—maintaining clean and safe floors—were basic duties all premises owners owe to their guests. *See id.* at 503. Neither the provision of health care on the premises nor the hospital's concern for patient safety were shown to have altered the safety standards that applied. *See id.* In other words, this was a standard premises liability claim in a health care setting, not a health care liability claim. *See id.* at 503–05.

There are four key holdings in *Ross* that altered the way courts would analyze safety standard-based claims moving forward. First, the *Ross* Court held that the mere fact that an injury occurs in a health care setting, without more, will not cause a claim to be a health care liability claim. *Id.* at 503. The hospital in *Ross* had argued that every claim arising from an injury on its premises had a sufficient nexus to health care because they all related to patient safety. *Id.* The Court disagreed, stating that a "safety standards-based claim does not come within the TMLA's provisions just because the underlying occurrence took place in a health care facility, the claim is against a health care provider, or both." *Id.*

Second, the *Ross* Court held that the safety standards allegedly violated must have a substantive relationship with the provision of medical or health care. *Id.* at 504 (stating that a claim is a safety-based health care liability claim only if there is "a substantive nexus between *the safety standards allegedly violated* and the provision of health care." (emphasis added)). This holding requires health care provider to identify particular safety standards and the court to analyze their connection to the provision of health care. *See id.*

Third, the *Ross* Court established the level of connection necessary between a violation of an identified safety standard and the provision of health care. *Id.* There "must be more than a 'but for' relationship." *Id.* The location where the injury occurred and the status of the defendant as a health care provider would not be

11

determinative. *Id.* at 504–05. Instead, the "pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's *duties as a health care provider*, including its duties to provide for patient safety." *Id.* at 505 (emphasis added). If so, there is a substantive nexus between the violation of an identified safety standard and the provision of health care. But when the claim implicates only the defendant's duties as a premises owner, unrelated to its provision of health care within that same premises, there is an inadequate nexus. *See id.*

Fourth, the *Ross* Court identified a list of seven non-exclusive factors for courts to consider when determining whether a claim based on an alleged violation of a safety standard is a health care liability claim:

1. did the alleged negligence of the defendant occur in the course of the defendant's performing tasks with the purpose of protecting patients from harm;

2. did the injuries occur in a place where patients might be during the time they were receiving care, so that the obligation of the provider to protect persons who require special, medical care was implicated;

3. at the time of the injury was the claimant in the process of seeking or receiving health care;

4. at the time of the injury was the claimant providing or assisting in providing health care;

5. is the alleged negligence based on safety standards arising from professional duties owed by the health care provider;

6. if an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care; and

12

7.   did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?

*Id.* at 505. Analysis of these factors, particularly the seventh, may involve comparing the allegedly negligent acts or omissions to potentially relevant government regulations. *See, e.g.*, *PHCC—La Hacienda Rehab. & Health Care Ctr. LLC v. Crume*, 492 S.W.3d 797, 801 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

The Texas Supreme Court has never held that the sway of one *Ross* factor can compel a conclusion that a claim is a health care liability claim; instead, the proper analysis has always been described as a balancing or weighing of the factors against each other. *See Belmont Vill. Hunters Creek TRS, LLC v. Marshall*, No. 01-18-00984-CV, 2020 WL 4873563, at *11 (Tex. App.—Houston [1st Dist.] Aug. 20, 2020, pet. denied) (mem. op.) (reasoning that "the *Ross* factors do not weigh in favor of Chapter 74's applicability."); *Iasis Healthcare Corp. v. Pean*, No. 01-17-00638-CV, 2018 WL 3059789, at *5 (Tex. App.—Houston [1st Dist.] June 21, 2018, pet. denied) (mem. op.) (concluding that, "on balance, the *Ross* factors demonstrate that [the] claim is substantively related to the [ ] provision of health care"); *Tex. Health Res. v. Coming Attractions Bridal & Formal, Inc.*, 552 S.W.3d 335, 341 (Tex. App.—Dallas 2018), *aff'd*, 595 S.W.3d 659 (Tex. 2020) ("While not all of the *Ross* factors indicate that CABF asserts a safety standards-based HCLC, the factors that do weigh strongly in favor of our conclusion.").

13

*Ross* changed the analysis that applied to safety standards-based cases. Before *Ross*, there had been support for requiring only a but-for relationship. *See Diversicare Gen. Ptr. Inc. v. Rubio*, 185 S.W.3d 842, 860–61 (Tex. 2005) (Jefferson, C.J., concurring in part, and dissenting in part). Also, the nexus requirement was assumed to be less exacting. *See Omaha Healthcare Ctr., LLC v. Johnson*, 246 S.W.3d 278 (Tex. App.—Texarkana 2009), *rev'd on other grounds*, 344 S.W.3d 392 (Tex. 2011). And finally, there were no factors to guide the courts.

Yet Village Green relies exclusively on pre-*Ross* cases to assert that Graves's claim is a safety standards-based health care liability claim.[5] It does not engage in the *Ross* framework or analyze any of the *Ross* factors in arguing that this is a health care liability claim. Instead, it looks to a case decided four years before *Ross* and argues that that case, *Omaha Healthcare Center v. Johnson*, dictates that the claims against it are safety standards-based health care liability claims.

### 2. *Johnson* and the combination of general and specific safety standards to show a connection to health care

Village Green's safety-standards argument relies mainly on the pre-*Ross* case of *Omaha Healthcare Center, LLC v. Johnson*, 344 S.W.3d 392 (Tex. 2011). It argues that, under *Johnson*, its alleged negligence in allowing an aggressive stray

---

[5] Village Green only incorporates *Ross* into its analysis to claim that it does not apply because *Ross* allegedly accepted the pre-*Ross* position that "claims involving failure to protect residents from harm" are safety claims, period. As explained later in this opinion, we reject this interpretation of *Ross*.

dog access to its residents would violate a safety standard because it has a general duty to provide its residents with a safe environment. According to Village Green, a general duty is all that is required under *Johnson* and the later case, *Ross*, does not upset that analysis.

*Johnson* involved a nursing home resident who was bitten by a brown recluse spider and died. *Id.* at 393. The estate of the deceased nursing home resident sued the nursing home under a premises-liability theory. *Id.* The nursing home argued the claim against it was a health care liability claim. *Id.* at 394.

The nursing home pointed to two sets of safety standards that it allegedly departed from in arguing that the claim against it was a safety standards-based health care liability claim. One set spoke to a general requirement to protect residents and provide "quality care" in a safe environment. *Id.* at 395 (citing 40 TEX. ADMIN. CODE §§ 19.1701, 19.309; TEX. HEALTH & SAFETY CODE § 242.001(a)(1), (8)). The other set of safety standards was specific to the danger that led to the resident's injuries and death. The Administrative Code required nursing homes to maintain an effective pest control program to eradicate insects. *Id.* (citing 40 TEX. ADMIN. CODE § 19.324, now at 26 TEX. ADMIN. CODE § 554.324). Nursing homes had a specific, statutory duty to protect their residents from pests, and this resident died from a spider bite. *See* 40 TEX. ADMIN. CODE § 19.324 (now at 26 TEX. ADMIN. CODE § 554.324(b)).

Both the trial court and the intermediate appellate court held that the claims against the nursing home did not qualify as safety standard-based health care liability claims. *Omaha Healthcare Ctr., L.L.C. v. Johnson*, 246 S.W.3d 278 (Tex. App.—Texarkana 2008), *rev'd*, 344 S.W.3d 392 (Tex. 2011). The Texas Supreme Court reversed. *See Omaha Healthcare Ctr, LLC v. Johnson*, 344 S.W.3d 393 (Tex. 2011). In doing so, the Court relied on *both* sets of safety standards. *Id.* at 395. Its holding did not rest solely on the existence of a general duty to provide a safe environment but also on a specific safety statute that had a substantive relationship with the claim—the nursing home had to have an effective pest control program, it allegedly did not because a brown recluse spider was on the premises, and the allegations of liability centered on that specific failure. *See Johnson*, 344 S.W.3d at 395.

The Texas Supreme Court has confirmed, post-*Johnson*, that general obligations to provide a safe environment, without more, are not enough to invoke the safety-claim portion of the definition of a health care liability claim. *See Galvan v. Memorial Hermann Hosp. Sys.*, 476 S.W.3d 429, 432–33 (Tex. 2015). There, a woman visiting a relative slipped and fell in a hospital when water spilled out of a bathroom into a hallway. *Id.* at 429. The hospital tried to cast her claim as a safety standards-based health care liability claim by pointing to general safety regulations that required the hospital to have a safe and sanitary premises and to use microfiber mops instead of conventional wet loop mops. The Court rejected the hospital's

16

argument, holding that there was no substantive relationship between the general safety standards and the provision of health care. *Id.* at 432–33.

Two years after *Galvan*, we also rejected a hospital's reliance on general safety standards to cast a premises liability claim as a health care liability claim. *See Houston Methodist Willowbrook Hosp. v. Ramirez*, 539 S.W.3d 495 (Tex. App.—Houston [1st Dist.] 2017, no pet.). In *Ramirez*, a patient visited her primary-care physician in his third-floor office. *Id.* at 497. Her doctor sent her from his office to the first floor for a chest x-ray. *Id.* Walking alone, she took the elevator to the first floor and passed through a pavilion on her way to radiology. While crossing through the pavilion, she slipped on the wet floor and was injured. *Id.* at 498.

The patient sued, asserting a premises liability theory that the hospital was negligent in permitting its floor to become slippery and not warning of the dangerous condition on its premises. *Id.* The hospital moved to dismiss, arguing she had asserted a health care liability claim based on an alleged safety standard violation. *Id.* It pointed to various licensing requirements that required it to have a safety program and to follow sanitation policies. *Id.* at 499–500. It also pointed to a general statutory duty to "provide a sanitary environment to avoid sources and transmission of infections and communicable diseases," which, it argued, implicated its duty to provide a clean and sanitary environment for its patients (including the floors), making it a necessary component of its provision of health care. *Id.* at 499–500.

Relying heavily on *Ross*, we rejected the hospital's arguments and held that the safety standards cited did not have a substantive nexus with providing health care; they implicated only the hospital's duties as a premises owner. *Id.* at 499. The duties at issue when a wet floor is left unattended without public warnings are the duties owed by premises owners generally and are not specific or unique to health care providers. *Id.* at 500 ("The record does not reveal that the hospital's alleged negligence was based on any safety standards uniquely arising from professional duties owed as a health care provider." (citing *Galvan*, 476 S.W.3d at 433)). The claimant was injured when she slipped and fell in a publicly accessible hallway. Yes, she was in the building to obtain medical care, but she was not actively receiving medical treatment when she walked down the public hallway between her doctor's office and the radiology department. *Id.*

We noted that courts have uniformly rejected allowing a general duty to provide a safe environment to transform a garden-variety premises-liability claim into a health care liability claim, and we held that this claimant had not asserted a health care liability claim. *Id.* (citing *Galvan*, 476 S.W.3d at 431–33 and *Reddic v. E. Tex. Med. Ctr. Reg'l Health Care Sys.*, 474 S.W.3d 672, 675–76 (Tex. 2015) (per curiam), both post-*Johnson* cases).

Village Green's argument that *Johnson* (decided four years before *Ross*) allows a general duty to provide a safe environment to cast a premises liability claim

18

as a safety standards-based health care liability claim is belied by the Texas Supreme Court's handling of such arguments in post-*Ross* cases, like *Galvan*, and our own in *Ramirez*.

It simply is not enough for Village Green to point to a general duty to provide a safe environment to turn every act or failure to act within its premises into a health care liability claim. *Johnson*, even when it was decided, did not support such an approach. It involved a specific safety regulation that had a substantive nexus to the underlying claims. *Johnson*, 344 S.W.3d at 395. And later cases, like *Galvan* and *Ramirez*, have reiterated that generalized safety duties do not provide an adequate nexus. *See Galvan*, 476 S.W.3d at 431–33; *Reddic*, 474 S.W.3d at 675–76; *Ramirez*, 539 S.W.3d at 500.

*Johnson* does not dictate that the claims against Village Green are safety standards-based health care liability claims. Instead, the framework developed in *Ross* will determine whether a substantive nexus exists because the safety standards identified implicate Village Green's duties as a health care provider versus general duties as a premises owner. *See Ross*, 462 S.W.3d at 505. Before turning to that analysis, we will first consider two intermediate court decisions that faced similar issues and arguments.

### 3. Dallas Court of Appeals requires that the applicable safety standard violated have a substantive nexus to health care

Earlier this year, the Dallas Court of Appeals issued an en banc opinion rejecting an assisted living facility's claim that its general duty to provide a safe environment for its residents had a sufficient nexus. *Faber v. Collin Creek Assisted Living Center, Inc.*, 629 S.W.3d 630, 643 (Tex. App.—Dallas 2021, pet. filed) (en banc opinion on rehearing). There, a resident was going to her son's car for an off-site appointment. *Id.* at 634. The resident was sitting on a wheeled walker that an employee was guiding down the sidewalk. *Id.* A wheel on the walker got caught in a crack in the sidewalk, causing the resident to fall and suffer fatal injuries. *Id.*

According to the en banc court, the gravamen of the complaint against the assisted living facility was inadequate sidewalk maintenance on its premises. *Id.* at 640, 642. That claim and the standards that applied had no substantive nexus to health care. *Id.* at 643.

The court rejected the contention that the claimant had artfully pled around a health care liability claim by focusing on the condition of the sidewalk when the nature of the claim could have been pled to challenge the conduct of the employee who maneuvered the resident's walker into the sidewalk's crack. *Id.* at 640 n.13. The en banc court explained that the petition had alleged facts "having nothing to do with a health care provider's failure to comply with professional duties and everything to do with the condition of the public sidewalk on the facility's premises. It was a

simple, run-of-the-mill premises liability case, where the instrumentality causing injury was broken concrete." *Id.* at 643.

The court emphasized that there was an inadequate nexus between the safety standards allegedly violated and health care by pointing out the disconnect between the TMLA's requirement of an expert report and the standard of care and breach at issue under the facts of the claim: proper maintenance of a sidewalk on the premises. *Id.* at 641–42; *see Baylor Univ. Med. Ctr. v. Lawton*, 442 S.W.3d 483, 487 (Tex. App.—Dallas 2013, pet. denied) (where nurse was injured by fumes and irritants from remediation of backed-up sewage in sink and shower drains, noting that "it would be difficult if not impossible to find a qualified expert under the statute who was also competent to opine on the relevant accepted standards of care for plumbing," which further signaled that the safety claim was untethered from health care and outside the statute); *cf. Diversicare Gen. Ptr. Inc. v. Rubio*, 185 S.W.3d 842, 848 (Tex. 2005) ("The necessity of expert testimony from a medical or health care professional to prove a claim may also be an important factor in determining whether a cause of action is an inseparable part of the rendition of medical or health care services.").

The suit to recover for injuries caused by the fall from the walker when its wheel got caught in the broken sidewalk was a garden-variety premises liability case. *Faber*, 629 S.W.3d at 643. That the person injured was a resident at the facility did

21

not dictate that claims for her injuries were health care liability claims. *See id.* The Dallas court's analysis dovetails with our own in *Ramirez.*

### 4. Houston's Fourteenth Court of Appeals reaches back to *Johnson* and allows a general duty to suffice

The Fourteenth Court of Appeals has set off in a different direction, accepting an argument that *Johnson* permits a health care provider to point to a general duty to provide residents with a safe environment to transform what would typically be considered a straightforward premises liability claim into a health care liability claim. *See Little v. Riverside Gen. Hosp. Inc.*, No. 14-14-00797-CV, 2016 WL 208142 (Tex. App.—Houston [14th Dist.] Jan. 14, 2016, no pet.) (mem. op.). In *Little*, a resident fell into a below-ground grease pit on a drug-treatment facility's premises. *Id.* at *1. The grease pit had been covered by an unsecured wooden pallet that gave way and allowed her to fall in as she tried to maneuver a child to safety. *Id.* The *Little* Court held that the failure to warn of a premises defect implicated the facility's duties as a health care provider because the facility had a general duty to provide a safe environment. *See id.* at *3.

In reaching this conclusion, the *Little* Court never acknowledged that the *Johnson* holding was based on a specific safety standard, nor did it require the drug-treatment facility to identify a specific safety standard that created a duty different from those shared by all premises owners. *See Ramirez*, 539 S.W.3d at 500 (rejecting argument that general duty to provide a safe environment has a substantive nexus to

22

health care because the claims arising from a slip and fall implicated duties of any premises owner not specific duties of health care providers); *Galvan*, 476 S.W.3d at 432–33 (hospital could not point to any duties specific to health care providers that had a substantive nexus to the health care).

The *Little* Court did not address the statement in *Ross* that more than a but-for relationship is required to have a substantive nexus between a safety standard violation and the provision of health care. Under *Ross*, it is not enough that one engages in health care on the same premises where an injury occurred. *See Ross*, 462 S.W.3d at 504. There must be a nexus between the safety standard violated and the provision of health care. *Id.* Both the *Ross* and *Galvan* cases establish that a general statutory duty to maintain a safe environment will not supply that connection. The *Little* Court failed to incorporate that holding into its analysis. And, even more troubling, the *Little* Court failed to analyze the factors the Texas Supreme Court set out in *Ross* to guide courts in determining whether a claim is a safety-based health care claim. *See generally Little*, 2016 WL 208142.

By short-circuiting the analysis to allow a but-for relationship to provide the required nexus, the *Little* Court impermissibly allowed the location of the injury and the status of the defendant health care provider to dictate the outcome of its analysis. *Cf. Ross*, 462 S.W.3d at 504 (requiring more than a but-for relationship between the standard allegedly violated and the provision of health care). We will not do the

23

same. Instead, as directed by the Texas Supreme Court, we will consider the seven *Ross* factors to determine whether Graves's claim is a safety-based health care claim. If, in the future, the Texas Supreme Court holds that a residential facility's general duty to provide a safe environment provides a sufficient nexus for that category of health care provider, the *Ross* factors aside, it can hold as much. It has not yet.

### 5. Analysis of the *Ross* factors to determine whether Graves's claim is a safety standards-based health care liability claim

Village Green's brief contains no analysis of the *Ross* factors. It does not argue how we should weigh individual factors or balance them against each other. Instead, Village Green's brief argues that its general, statutory duty to provide a safe environment for its inpatient residents turns injury claims into health care liability claims outside the *Ross*-factors analysis. Because Village Green makes no arguments, we only mention Graves's arguments in our analysis below.

### a. Factor one: Did the alleged negligence of the defendant occur in the course of the defendant's performing tasks to protect patients from harm?

According to Graves, the first factor does not support characterizing her claim as a health care liability claim because housing stray dogs is severable from any actions taken with a purpose of protecting patients from harm. We agree. The alleged negligence underlying the claim against Village Green is failing to guard against or warn of a dangerous condition on the premises—an aggressive dog that has known tendencies to lunge at and injure people. Norma Graves was in a public, common

24

area of the premises when Charlie lunged at her from the lobby couch where he was sitting. Graves had been walking through the common area unaccompanied by Village Green employees or staff. According to descriptions of the surveillance video, there was no Village Green employee performing any tasks in the room where she was injured.

We are not persuaded by the potential argument that Village Green is continuously performing tasks to protect its residents under its over-arching duty to provide for the residents' fundamental needs. In our view, the phrase "in the course of the defendant's performing tasks" requires some spatial connection between what the defendant was allegedly negligently doing at the time of the injury and where the resident was injured. If Village Green employees were not in the part of the building where the injury happened when it occurred, they cannot be said to have been *in the course of* performing a task to protect the resident there. *Cf. Ramirez*, 539 S.W.3d at 500 (woman who was in a health care facility to receive health care was not in the course of receiving care while walking alone through a public pavilion).

### b. Factor two: Did the injury occur where patients might be while they were receiving care, implicating the provider's obligation to protect people who require special medical care?

Nothing in the record suggests that Graves or other residents receive care in the lobby of the facility versus in their individual rooms. But given the type of facility this is, we believe it is appropriate to infer that these residents, who suffer

25

from varying degrees of dementia, might receive some care in common areas at times. Their care is not limited to typical medical care. Known aspects of dementia include memory loss and accompanying confusion. The lobby might be a place where residents receive some form of care, at times, such as assistance moving about the building. This factor favors Village Green.

### c. Factor three: At the time of the injury was the claimant in the process of seeking or receiving health care?

Like factor one, we conclude that this factor favors Graves. There were no Village Green employees in the room where Graves was injured when she was injured. Graves was not engaging any staff when she walked up to Charlie to pet him. Nor was any Village Green employee interacting with her to provide any form of care at the time. In our view, this factor is not satisfied by merely pointing to Village Green's over-arching obligation to provide for its residents' fundamental needs.

This factor asks whether Graves was *in the process of* seeking or receiving health care at the time of her injury. Because there was no interaction between Graves and any staff while Graves was walking through the common area as a visitor or guest might, we conclude that she was not in the process of seeking or receiving health care in that moment. *Cf. Ramirez*, 539 S.W.3d at 500 (woman was at health care facility to receive health care, but she was not receiving care while walking alone through a public pavilion).

### d.    Factor four: At the time of the injury was the claimant providing or helping provide health care?

Graves was not providing or helping provide health care. She was trying to pet a dog lying on a lobby couch.

### e.    Factor five: Is the alleged negligence based on safety standards arising from professional duties owed by the health care provider?

As our earlier analysis explains, the safety standards Village Green points to are general safety standards that do not implicate professional duties owed by health care providers specifically. General safety obligations are shared by all premises owners. *Galvan*, 476 S.W.3d at 433; *Ramirez*, 539 S.W.3d at 500. There is no substantive relationship between a general duty to provide a safe dementia-care environment and a dog mauling any more than there is a connection between a hospital's general duty to avoid infectious disease and a person slipping on a wet floor. *See Galvan*, 476 S.W.3d at 433. The non-specific duty fails because it reaches far and wide but without substantively connecting to anything.

Village Green has not pointed to any safety standards that address the appropriate housing or care of stray dogs by health care facilities. One can imagine that no such regulation exists as the two have no connection. This factor weighs against Village Green.

**f.    Factor six: If an instrumentality was involved in the defendant's alleged negligence, was it a type used in providing health care?**

The instrumentality here was a stray dog. Stray dogs play no role in health care. One has nothing to do with the other. *See Faber*, 629 S.W.3d at 639 (concluding that crack in sidewalk was instrumentality involved in alleged negligence and that it had no connection to health care). This factor weighs against Village Green as well.

**g.    Factor seven: Did the alleged negligence occur in the course of the defendant's taking action or failing to take action necessary to comply with safety-related requirements set for health care providers by governmental or accrediting agencies?**

Again, Village Green points to no safety requirements set for and specific to health care providers as it relates to housing stray dogs on its premises. It can point only to a general statutory duty to provide a safe environment for its residents. The allegedly negligent failure to warn or guard against a dangerous stray dog on its premise has no connection to safety-related requirements specific to health care providers. *See id.* at 639–40.

**h.  Conclusion**

The only factor that weighs in Village Green's favor is factor two. Residents may, at times, receive care in the lobby of their facility given the nature of the residents' health conditions. But the other factors that address what actually occurred

outweigh what might happen in the abstract. Here, there was no active care occurring at the time of the dog attack. Graves was alone. She was not being guided through the common area of the facility by a Village Green employee. Village Green was not interacting with her on any level. All these other factors weigh against concluding that an injury claim arising out of a stray dog mauling a resident in a public lobby is a health care liability claim. On balance, the *Ross* factors favor Graves.

The trial court's written opinion denying Village Green's motion does not provide a factor-based analysis in concluding that Graves's claim is not a health care liability claim. But it does help explain the court's reasoning. The order focuses on the lack of an adequate nexus between the allegations of negligence and the provision of care to residents. The trial court determined that Village Green's acquiescence to housing a stray dog on its premises and permitting it to roam its common areas was independent of its interactions with and care for its residents. The trial court concluded that neither role informed the other:

> Plaintiff is under no obligation to produce an expert report saying it was a bad idea to care for humans and dogs in the same space any more than it would be necessary to produce an expert report that it is a bad idea to care for humans and run a nuclear reactor in the same space; two independent actions which have nothing to do with each other except that it is a very bad idea to do both in the same space.

This is not a health care liability claim. It is a simple premises liability action based on the presence of an aggressive dog on the premises that attacked and injured a woman unaware of the dog's aggressive tendencies. The reasoning in *Ross*,

*Ramirez*, and *Faber* naturally extends to the facts and claims in this case. Complaints of a slippery floor or a crack in a sidewalk are properly pled as a premises liability claim. *See Ramirez*, 539 S.W.3d at 500; *Faber*, 629 S.W.3d at 642. Likewise, complaints about an aggressive dog on a premises that injures a person is properly pled as a premises liability claim.[6] *See Castrejon v. Horton*, No. 14-16-00520-CV, 2017 WL 4797730, at *4 (Tex. App.—Houston [14th Dist.] Oct. 24, 2017, no pet.) (mem. op.).

Generally, a premises liability claim requires proof of (1) actual or constructive knowledge of a condition on the premises by the owner; (2) the condition posed an unreasonable risk of harm; (3) the owner did not exercise reasonable care to reduce or eliminate the risk; and (4) the owner's failure to use such care proximately caused the plaintiff's injury. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000). The presence of a dangerous dog can qualify as a dangerous condition. *See Castrejon*, 2017 WL 4797730, at *4 (stating that, in a dog-bite case, injured parties may sue a property owner under a premises liability theory, with the duty owed by the landowner dependent on the status of the person injured on the premises); *Mattox v. Timmerman*, No. 03-13-00107-CV, 2013 WL 4516125

---

[6]     Texas provides three potential claims for people who have been injured by a dog or other domestic animal: strict liability, negligent handling, and premises liability. *Castrejon v. Horton*, No. 14-16-00520-CV, 2017 WL 4797730, at *4 (Tex. App.— Houston [14th Dist.] Oct. 24, 2017, no pet.) (mem. op.).

(Tex. App.—Austin Aug. 22, 2013, no pet.) (mem. op.) (acknowledging premises liability theory for dog attacks).

If the person bit was an invitee, the duty owed by the premises owner is a duty to exercise ordinary care to keep his premises in a reasonably safe condition, so that the plaintiff would not be injured. *See Searcy v. Brown*, 607 S.W.2d 937, 941 (Tex. App.—Houston [1st Dist.] 1980, no writ) (dog-bite case); *see also Brunson v. Christian Youth Found.*, No. 12-12-00186-CV, 2013 WL 1668233 (Tex. App.— Tyler Apr. 17, 2013, pet. denied) (mem. op.) (tripping-over-dog case).

The essence of Graves's complaint is that Village Green had an unsupervised, dangerous dog on its premises wandering the common areas and that the dog attacked Norma Graves, causing her injuries. Generalized, non-specific duties to provide a safe environment do not turn this garden-variety premises-liability claim into a health care liability claim. *See Galvan*, 476 S.W.3d at 433; *Ramirez*, 539 S.W.3d at 500.

Village Green does not point to any safety regulations specific to residential facilities that heighten or alter in any way the standard for having stray dogs wandering one's premises. Whatever standards apply to the existence of an aggressive dog on one's premises, it originates in premises liability law. The safety

standards at issue have no substantive nexus to health care.[7] *See Galvan*, 476 S.W.3d at 433; *Ramirez*, 539 S.W.3d at 500.

Having concluded that the claim against Village Green is not a safety standards-based health care liability claim, we turn to Village Green's alternative argument.

**B.    Health care**

Village Green's alternative argument is that Graves's claim qualifies as a health care liability claim because it involves an alleged departure from accepted standards of health care, relying on the broad definition of health care found in the statute. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10) (defining health care as "any act . . . that should have been performed by any health care provider for, to, or on behalf of a patient during the patient's . . . confinement").

---

[7]    Various judges have remarked in their separate writings that minimizing the nexus required on claims that have not typically been considered medical malpractice claims to bring them within the TMLA can counteract the Legislature's intentions in enacting the TMLA. They note that, when a claim that has historically not been considered a medical malpractice claim is litigated as a health care liability claim due to courts' ruling that the TMLA applies, that claim is likely to migrate from the health care provider's general liability policy's coverage to its medical malpractice policy's coverage. *See Diversicare,* 185 S.W.3d at 862 (O'Neill, J., dissenting) (citing *Cochran v. B.J. Servs. Co. USA*, 302 F.3d 499, 502 (5th Cir. 2002)); *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 686 (Tex. 2010) (Guzman, J., concurring and dissenting); *Johnson*, 344 S.W.3d at 399 (Lehrmann, J., dissenting). When more categories of claims fall under the medical malpractice policy, the premiums for such policies can be expected to increase. *Diversicare*, 185 S.W.3d at 862 (O'Neill, J., dissenting); *Marks*, 319 S.W.3d at 686 (Guzman, J., concurring and dissenting).

Village Green argues that any failure to protect a resident population from harm is an alleged departure from accepted standards of health care. They cite in support of this proposition a string of cases, all of which involved allegations of assault in a health care setting by a health care worker or patient. *See, e.g.*, *Diversicare*, 185 S.W.3d at 849. In these cases, the courts held that the core of the assault claim was either that the health care provider failed to adequately train and staff to prevent harm or failed to adequately monitor a patient to whom it was providing medical care to ensure that the patient did not become violent against staff or other patients. *See*, *e.g.*, *Oak Park, Inc. v. Harrison*, 206 S.W.3d 133, 139, 141 (Tex. App.—Eastland 2006, no pet.) ("Harrison's claims allege a departure from accepted standards of medical or health care because the act or omission complained of—the failure to protect Harrison from the psychological patient—is inseparable from the health care services provided to him.").

While "health care" is broadly defined, what constitutes an alleged departure from accepted standards of health care has limits. There must be a direct connection between the health care standard and the provision of medical services. *See Diversicare*, 185 S.W.3d at 848. As explained by the Texas Supreme Court: "A cause of action alleges a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services." *Id.* In determining whether a cause of action is

33

an *inseparable* part of the rendition of medical services, the need for expert testimony from a medical professional to prove the claim is an important factor. *See id.* (citing *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 544 (Tex. 2004)).

Thus, when a psychiatric inpatient died after employees restrained him to end his violent attack—and the claims against the facility turned on whether the health care provider adhered to appropriate standards of care for restraining a psychiatric patient, supervising and training those who would restrain the psychiatric patient, and administering effective medications to subdue the psychiatric patient—the acts or omissions complained of were inseparable parts of the rendition of medical services. *See Rogers v. Bagley*, 623 S.W.3d 343, 351 (Tex. 2021); *see also Psychiatric Sols., Inc. v. Palit*, 414 S.W.3d 724, 725–26 (Tex. 2013). Likewise, a nursing home resident's claim of being sexually assaulted by another resident was a health care liability claim because the facility's training and staffing policies and supervision and protection of the patient and other residents were integral components of—meaning an inseparable part of—the facility's rendition of health care services. *See Diversicare*, 185 S.W.3d at 845, 850.

To be sure, nursing homes and other residential facilities provide a broader array of services to those in their care than a medical office would during a short check-up visit. Residential facilities supervise daily activities, provide routine examinations, provide dietary services, monitor the physical and mental conditions

34

of its residents, and meet fundamental care needs for those residents. *Id.* at 849–50. The "level and types of health care services provided vary with the needs and capabilities of the patients." *Ortiz v. St. Teresa Nursing & Rehab. Ctr., LLC*, 579 S.W.3d 696, 704 (Tex. App.—El Paso 2019, pet. denied). A facility must evaluate whether some patients require enhanced supervision and more staff to protect them from injuring themselves or possibly other patients or staff. *See Diversicare*, 185 S.W.3d at 849–50; *Ortiz*, 579 S.W.3d at 704. "The nature and intensity of care and treatment, including professional supervision, monitoring, [and] assessment . . . are judgments made by professionals trained and experienced in treating and caring for patients and the patient populations in their health care facilities." *Diversicare*, 185 S.W.3d at 850.

But case law does not suggest that every tort—or even every assault—in a health care setting involves an alleged departure of standards for health care to meet the TMLA's definition of a health care liability claim. *Loaisiga* provides an example. That 2012 case involved a physician who was alleged to have fondled the breasts of two female patients while examining one for a "sinus problem" and the other for "flu-like symptoms." *Loaisiga*, 379 S.W.3d at 252–53. The court noted the expansive definition of health care but then focused on the scope of consent to have the physician touch patients' bodies during a medical exam. *Id.* at 257. It noted that at times it may be necessary to have an expert's opinion on the proper standard of

care for touching certain parts of a patient's body given the particular complaints that led to the exam. *Id.* At other times, though, no expert report would be needed because "the conduct of which a plaintiff complains is wholly and conclusively inconsistent with, and thus separable from, the rendition of medical care." *Id.* (internal quotes removed).

The *Loaisiga* Court held that a claim against a medical or health care provider for assault is not a health care liability claim if the record shows that (1) there is no complaint about any act of the provider related to medical or health care services other than the alleged offensive contact, (2) the alleged offensive contact was not pursuant to actual or implied consent by the plaintiff, and (3) the "only possible relationship between the alleged offensive contact and the rendition of medical services or healthcare was the setting in which the act took place." *Id.* The assault claims against the doctor in *Loaisiga* were not health care liability claims.

Similarly, a residential facility can act in an allegedly negligent manner that is so disconnected from the care provided that it is separate from the rendition of medical care. For example, when a facility prohibited residents from adding locks to the doors of their private quarters and had no health care-related reason for doing so, the claim arising from a sexual assault in the resident's quarters was separable from the rendition of medical services, and thus was not a health-care-standards health care liability claim. *Belmont Vill. Hunters Creek TRS, LLC v. Marshall*, No. 01-18-

00984-CV, 2020 WL 4873563, at \*7 (Tex. App.—Houston [1st Dist.] Aug. 20, 2020, pet. denied) (mem. op.). The *Loaisiga* and *Marshall* cases show that the alleged negligence can be so far removed from the provision of health care that it is analytically separate from it.

Relevant to whether a claim is inseparable from medical services is whether expert testimony is necessary to establish the applicable standard of care to evaluate breach, whether the alleged act involves medical judgment related to patient care, and whether a specialized standard in the healthcare community applies. *Diversicare*, 185 S.W.3d at 848–51. "[I]f expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim." *Tex. W. Oaks Hosp., L.P. v. Williams*, 371 S.W.3d 171, 182 (Tex. 2012). "And only if expert testimony is not needed should a court proceed to consider the totality of the circumstances, as a claim may still be a health care liability claim despite that 'in the final analysis, expert testimony may not be necessary to support a verdict.'" *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 760 (Tex. 2014).

In *Diversicare*, the Court held that no expert testimony was needed to establish that the standard of care for evaluating a patient's sinuses does not include fondling the patient's breasts. *Diversicare*, 185 S.W.3d at 848–51. Likewise, no expert testimony was needed to establish the standard of care for clearing clogged

drains in a manner that would not accumulate toxic fumes, even in a medical setting. *See Lawton*, 442 S.W.3d at 487. That involved plumbing expertise, not medical judgment. *See id.*

No expert report is necessary here to establish the standard of care for housing stray dogs in common areas of a building accessible to the public, even if medical care occurs in and around the area. The relevant standards come from tort law developed through the common law to address dangers on premises. They have no dependence—or even connection—to medical care or medical judgment.

Not every action a health care provider takes on its premises can be shoved under the heading of medical care. Some actions (and failures to act) are so unanticipated and unrelated that the only connection to health care is the setting in which the events occur. *See Ross*, 462 S.W.3d at 504; *Loaisiga*, 379 S.W.3d at 252–53. Much like in *Loaisiga*, this claim is separate from health care services because the dog attack had no connection to the residential services Graves consented to and is only connected to health care because of the fortuity of the location. *Loaisiga*, 379 S.W.3d at 252–53 (suit arising from assault that occurred during a medical exam not a health care liability claim). In our view, the facts underlying Graves's claims fall into this territory, fully separable from the rendition of medical care.

In sum, Village Green accepted the housing of a stray dog on its premises. These same premises were used for caring for residents with Alzheimer's. But there

was no connection between the two activities. They were apparently meant to peacefully co-exist alongside one another. Tragically, they did not. But the location of their unfortunate merger cannot bring the allegedly negligent acts within the scope of the TMLA: housing a stray dog is not inseparable from the rendition of medical care.

## Conclusion

We have held that Graves's suit does not present a health care liability claim.[8] As a result, the second issue regarding the sufficiency of any expert reports is moot.

We affirm the trial court's order denying Village Green's motion to dismiss.

Sarah Beth Landau
Justice

Panel consists of Justice Goodman, Landau and Countiss.

---

[8] At times, the facts of a claim may raise a rebuttable presumption that the claim is a health care liability claim and shift the burden to the claimant to prove otherwise. *See Rio Grande Valley Vein Clinic, P.A. v. Guerrero*, 431 S.W.3d 64, 65 (Tex. 2014) (per curiam); *Ortiz v. St. Teresa Nursing & Rehab. Ctr., LLC*, 579 S.W.3d 696, 703 (Tex. App.—El Paso 2019, pet. denied). In our view, even if the rebuttable presumption applies here, Graves met the burden of rebutting the presumption given the lack of nexus between the standards allegedly violated and the provision of health or medical care.